**FILED**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT ARKANSAS**

JUN 1 9 2020

JAMES W. McCORMACK, CLERK

By: _____ _____
                                    **DEP CLERK**

I Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

# UNITED STATES DISTRICT COURT

for the

District of

Division

Case No. **4:20-CV-769-BSM**
(to be filled in by the Clerk's Office)

George Richard Clark III

Plaintiff(s)

(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)

Christopher Scott Stanger

Defendant(s)

(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)

This case assigned to District Judge **Miller**
and to Magistrate Judge **Kearney**

## COMPLAINT AND REQUEST FOR INJUNCTION

I.    The Parties to This Complaint

    A.    The Plaintiff(s)

        Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

        Name      George Richard Clark
        Street Address    3907 Hillside Dr.
        City and County    N. Little Rock  Pulaski
        State and Zip Code  Arkansas  72118
        Telephone Number  501-442 1010
        E-mail Address  grclarkboys@yahoo.com

    B.    The Defendant(s)

        Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

        Defendant No. 1
        Name    Christopher Scott Stanger

Page of   6

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

Job or Title *(if known)*    Director of Human Resources
Street Address    J.T. Camp Robinson Bldg 6000
City and County    N. Little Rock    Pulaski
State and Zip Code    Arkansas 72199
Telephone Number    (501) 212-5164
E-mail Address *(if known)*

**Defendant No. 2**
Name    Hugh Leavell
Job or Title *(if known)*    Supervisor at Youth Challenge
Street Address    J.T. Camp Robinson Bldg 16414
City and County    N. Little Rock    Pulaski
State and Zip Code    Arkansas 72199
Telephone Number    501-212-5304
E-mail Address *(if known)*

**Defendant No. 3**
Name    General Kendall Penn
Job or Title *(if known)*    General of Camp Robinson
Street Address    J.T. Camp Robinson Bldg 6000
City and County    N. Little Rock,    Pulaski
State and Zip Code    Arkansas, 72199
Telephone Number    (501) 212-5000
E-mail Address *(if known)*

**Defendant No. 4**
Name    Joe Mallet
Job or Title *(if known)*    Director of Youth Challenge
Street Address    J.T. Camp Robinso Bldg 16414
City and County    N. Little Rock    Pulaski
State and Zip Code    Arkansas 72199
Telephone Number    (501) 212-5344
E-mail Address *(if known)*

II.    **Basis for Jurisdiction**

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☐ Federal question       ☐ Diversity of citizenship

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

Fill out the paragraphs in this section that apply to this case.

A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

_Discrimination of Race and Retaliation_

B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

a.    If the plaintiff is an individual
      The plaintiff (name) _George Richard Clark_ is a citizen of the State of (name) _Arkansas_

b.    If the plaintiff is a corporation
      The plaintiff, (name) _A_ is incorporated under the laws of the State of (name) _____
      and has its principal place of business in the State of (name) _____

(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)

2.    The Defendant(s)

a.    If the defendant is an individual
      The defendant (name) _Christopher Scott Stanger_ is a citizen of the State of (name) _Arkansas_ Or is a citizen of (foreign nation) _____

b.    If the defendant is a corporation
      The defendant (name) _____ is incorporated under the laws of the State of (name) _____ and has its principal place of business in the State of (name) _Arkansas_
      Or is incorporated under the laws of (foreign nation) _____
      and has its principal place of business in (name) _____

(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)

3.    The Amount in Controversy

The amount in controversy  the amount the plaintiff claims the defendant owes or the amount at stake is more than $75,000, not counting interest and costs of court, because (explain):

_Pain And Suffering $500,000_
_I Had to seek Counseling from A Therapist,_
_Because of the retaliation and discrimination displayed_
_by supervisor And Director of Human Resources (Stanger)_
_(Leavell). This is the second time Supervisor had harrass_
_And threathened termination. see Attachment A_

Page of 6

I Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction



Paladin Counseling Services, LLC
401 Main St, Suite 204
North Little Rock, AR 72114
(501) 707-4146

Mr. George Clark
3907 Hillside Dr.
North Little Rock, AR 72118

Dear Mr. Clark,

Per your request, I'm providing you with a summary of care and progress notes to be used at your discretion.

Presenting complaint:

Mr. Clark was initially referred to this author by his EAP. He was experiencing increased stress in his workplace due to his supervisor. This individual was his supervisor on a previous occasion and was removed after Mr. Clark registered a substantiated grievance against him. Having this same supervisor again was particularly distressing because Mr. Clark feared reprisal from his supervisor. The supervisor had been admonished and removed from his position as a result of substantiated grievance.

Diagnosis:

Adjustment Disorder with anxiety

Interventions:

From April 25 to November 20, 2019 this author provided supportive counseling and assistance with problem solving during 11 sessions attended by Mr. Clark. A cognitive-behavioral approach was also utilized in symptom relief. The goal of care was generally to alleviate feelings of anxiousness Mr. Clark was experiencing.

Follow up recommendations:

At the Mr. Clark's discretion.

Prognosis:

Good

Respectfully,

24 APR 2020

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

**S:** Date of session: 20NOV2019   Time of Session: 1600 -- 1650 Client: George Clark

Content of session:

Ct reported ongoing frustrations ō supervisor.
Awaiting EOC decision. Ct processed thoughts
and feelings. Reviewed coping skills and
rescheduled. JK

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

**O:** Ct. presented well-groomed and appropriately dressed? ✓ Normal speech and motor activity? ✓ Affect and mood congruent? ✓ SM denied / ENDORSED current SI/HI. Thought content WNL? ✓ Thought process was linear and goal-directed? ✓ Insight and judgment intact? ✓ Other observations: _____

**A:** See intake for static risk factors.
1. Change in risk factors? n/a OR _____
2. Change in protective factors? n/a OR _____
3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT
Change in diagnoses? n/a OR Adjustment Disorder ē Anxiety
**P:** Next session date: 04JAN2020   time: 1600

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ♯ Anxiety | See intervention listed above | 2 |
| | See intervention listed above | |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

S: Date of session: 09OCT2019 Time of Session: 1600 -- 1700 Client: George Clark

Content of session:

Ct reported ongoing frustration & supervisor and efforts for HR. He reported he is keeping a low profile and staying off radar. He continues to maintain a positive attitude "It'll work out." Th normalized Ct's experience and associated feelings. Discussed ways to manage stress. JT

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem-solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

O: Ct. presented well-groomed and appropriately dressed? _Y_ Normal speech and motor activity? _Y_. Affect and mood congruent? _Y_. SM denied / ENDORSED current SI/HI. Thought content WNL? _Y_ Thought process was linear and goal-directed? _Y_ Insight and judgment intact? _Y_ Other observations: _N/A_

A: See intake for static risk factors.
1. Change in risk factors? n/a OR _____
2. Change in protective factors? n/a OR _____
3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT

Change in diagnoses? n/a OR _____
P: Next session date: 14NOV19 _____ time: 1600 _____

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ✓ Anxiety | See intervention listed above | 2 |
| | See intervention listed above | |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

This author accidentally charged $60 for session, realized error, and refunded $30 via Square. JT

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

**S:** Date of session: 12 SEP 2019    Time of Session: 1600 -- 1650 Client: George Clark

Content of session:

Ct reported continued issues w/ supervisors; still awaiting decision from EEOC. Discussed thoughts and feelings about situation. Ct reported continued positive thinking and focuses on important things in life. RC Th reinforced ct's coping. ☺

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

**O:** Ct. presented well-groomed and appropriately dressed? ✓ Normal speech and motor activity? ✓ Affect and mood congruent? ✓ . SM denied / ENDORSED current SI/HI. Thought content WNL? ✓ Thought process was linear and goal-directed? ✓ Insight and judgment intact? ✓ Other observations: N/A

**A:** See intake for static risk factors.
1. Change in risk factors? n/a OR
2. Change in protective factors? n/a OR
3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT
Change in diagnoses? n/a OR
**P:** Next session date: 09 OCT 19    time: 1600

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ✓ Anxiety | See intervention listed above | 3 |
| | See intervention listed above | |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

**S:** Date of session: 21AUG19   Time of Session: 1600 -- 1700 Client: George Clark

Content of session:

Cl reported unfavorable response from CEOC. Cl reported he is undeterred and will continue to believe things will work out for the best. Th reinforced cl's reframe. Discussed cl's passion for job and positive attributes which he finds helpful in completing tasks. Discussed termination. Cl reported he will call back to reschedule as fee for service or add'tl EAP.

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / ⟨problem solving⟩ / ⟨supportive therapy⟩ / crisis response planning / psychoeducation / Consultation / Other: _____

Response to intervention: Client ⟨seemed receptive⟩ / Client seemed ambivalent / Client seemed resistant / Other: _____

**O:** Ct. presented well-groomed and appropriately dressed? Y Normal speech and motor activity? Y. Affect and mood congruent? Y. SM denied / ENDORSED current SI/HI. Thought content WNL? Y Thought process was linear and goal-directed? Y. Insight and judgment intact? Y. Other observations: N/A

**A:** See intake for static risk factors.
1. Change in risk factors? n/a OR _____
2. Change in protective factors? n/a OR _____
3. Current suicide risk level: a. ⟨Not currently at clinically significant risk⟩ / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT

Change in diagnoses? n/a OR _____

**P:** Next session date: TBD _____ time: _____

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | see above | 2 |
| ↑ Problem Solving | '' '' | 2 |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

**S:** Date of session: _07 AUG 2019_ Time of Session: _1600 -- 1700_ Client: _George Clark_

Content of session:

Ct reported being written up @ work by supervisor
Ct stated he has information to rebut for rebuttal
Discussed Ct's thoughts and feelings about the
ongoing problem.

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

**O:** Ct. presented well-groomed and appropriately dressed? ✓ Normal speech and motor activity? ✓ Affect and mood congruent? ✓ SM denied / ENDORSED current SI/HI. Thought content WNL? ✓ Thought process was linear and goal-directed? ✓ Insight and judgment intact? ✓ Other observations: _NA_

**A:** See intake for static risk factors.

1. Change in risk factors? n/a OR _____

2. Change in protective factors? n/a OR _____

3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT

Change in diagnoses? n/a OR _____

**P:** Next session date: _21 AUG 2019_ time: _1600_

| Treatment goals: | Intervention(s): | | Progress: |
|---|---|---|---|
| ↓ Anxiety | see above | | 3 |
| ↑ Problem Solving | " | " | 3 |

1-Significantly improved 2-Somewhat improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

S: Date of session: __18 JUL 19__   Time of Session: __1600-1650__ Client: __George Clark__

Content of session:

Ct reported met ē EEO and grievance process is progressing. Discussed ✗ Cts thoughts and feelings about his current work environment. Ct reported focusing on the positive things in his life. Th reinforced ct outlook. ✗g

Intervention(s): ~~cognitive-behavioral techniques~~ / cognitive processing techniques / motivational interviewing techniques / ~~problem solving~~ / ~~supportive therapy~~ / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: ~~Client seemed receptive~~ / Client seemed ambivalent / Client seemed resistant / Other:

O: Ct. presented well-groomed and appropriately dressed? _✓_ Normal speech and motor activity? _✓_. Affect and mood congruent? _✓_. SM denied / ENDORSED current SI/HI. Thought content WNL? _✓_ Thought process was linear and goal-directed? _✓_ Insight and judgment intact? _✓_ Other observations: _n/a_

A: See intake for static risk factors.
1. Change in risk factors? n/a OR _____
2. Change in protective factors? n/a OR _____
3. Current suicide risk level: a. Not currently at clinically significant risk / b. ~~Currently at clinically significant risk~~, but NOT imminent / ~~c. Currently at clinically significant risk, IMMINENT~~
Change in diagnoses? n/a OR _____
P: Next session date: __07 AUG 2019__ time: __1600__

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | Support / problem solving | 2 |
| ↑ Problem solving | '' '' '' | 2 |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

S: Date of session: 25 JUN 2019 Time of Session: 1600 -- 1700 Client: George Clark

Content of session:

Cf continues to have problems ī supervisor.
Looking for ward to 09 JUN EOC hearing.
Hoping for positive result. Th Cf processed
frustrations regarding situation. ☺☺

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

O: Ct. presented well-groomed and appropriately dressed? ✓. Normal speech and motor activity? ✓. Affect and mood congruent? ✓ SM denied / ENDORSED current SI/HI. Thought content WNL? ✓ Thought process was linear and goal-directed? ✓ Insight and judgment intact? ✓ Other observations: _____

A: See intake for static risk factors.

1. Change in risk factors? n/a OR _____

2. Change in protective factors? n/a OR _____

3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT

Change in diagnoses? n/a OR _____

P: Next session date: 16 JUL 2019 time: 1600

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | Support / problem solving | 2 |
| ↑ Problem Solving | | 2 |

1-Significantly improved 2-Somewhat improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

S: Date of session: _05 JUW 2019_   Time of Session: _1600_ -- _1700_   Client: _George Clark_

Content of session:

Cf continues to report frustrations ⊥ supervisor who wrote him up today. Processed thoughts and feelings about this. ~~Assessed~~ Th attempted to re Frame ct's understanding of situation. ~~QS~~

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

O: Ct. presented well-groomed and appropriately dressed? ✓. Normal speech and motor activity? ✓. Affect and mood congruent? ✓. SM denied / ENDORSED current SI/HI. Thought content WNL? ✓ Thought process was linear and goal-directed? ✓. Insight and judgment intact? ✓. Other observations: _N/a_

A: See intake for static risk factors.
1. Change in risk factors? n/a OR _____
2. Change in protective factors? n/a OR _____
3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT
Change in diagnoses? n/a OR _____
P: Next session date: _25 JUW 2019_   time: _1600_

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | see above | 3 |
| ↑ Problem Solving | '' '' | 3 |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

**S:** Date of session: _21 MAY 2019_ Time of Session: _1600 -- 1700_ Client: _George Clark_

Content of session:

Ct reported ongoing frustrations @ work & supervisor. We discussed factors contributing to problems @ work. Th attempted to reframe problem and prompt problem-solving discussion

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / supportive therapy / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: Client seemed receptive / Client seemed ambivalent / Client seemed resistant / Other:

**O:** Ct. presented well-groomed and appropriately dressed? _Y_. Normal speech and motor activity? _Y_. Affect and mood congruent? _Y_. SM denied / ENDORSED current SI/HI. Thought content WNL? _Y_ Thought process was linear and goal-directed? _Y_. Insight and judgment intact? _Y_. Other observations: _N/A_

**A:** See intake for static risk factors.

1. Change in risk factors? n/a OR _____

2. Change in protective factors? n/a OR _____

3. Current suicide risk level: a. Not currently at clinically significant risk / b. Currently at clinically significant risk, but NOT imminent / c. Currently at clinically significant risk, IMMINENT

Change in diagnoses? n/a OR _____

**P:** Next session date: _05 JUN 2019_ time: _1600_

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | Problem solving | 2 |
| ↑ Problem Solving | "    " | 2 |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Progress Note

**S:** Date of session: _02 MAY 2019_ Time of Session: _1600_ -- _1700_ Client: _George Clarke_

Content of session:

_Discussed ongoing work problems._
_Ct reported plan to avoid conflict but_
_ready to respond accordingly if needed._
_Discussed importance of mitigating conflict_
_and positive benefits. gm_

Intervention(s): cognitive-behavioral techniques / cognitive processing techniques / motivational interviewing techniques / problem solving / ~~supportive therapy~~ / crisis response planning / psychoeducation / Consultation / Other:

Response to intervention: ~~Client seemed receptive~~ / Client seemed ambivalent / Client seemed resistant / Other:

**O:** Ct. presented well-groomed and appropriately dressed? _✓_ Normal speech and motor activity? _✓_. Affect and mood congruent? _✓_ SM denied / ~~ENDORSED~~ current SI/HI. Thought content WNL? _✓_ Thought process was linear and goal-directed? _✓_ Insight and judgment intact? _✓_ Other observations: _____

**A:** See intake for static risk factors.

1. Change in risk factors? n/a OR _N/A_

2. Change in protective factors? n/a OR _N/A_

3. Current suicide risk level: a. Not currently at clinically significant risk / b. ~~Currently at clinically significant risk, but NOT~~ ~~imminent~~ / c. ~~Currently at clinically significant risk, IMMINENT~~

Change in diagnoses? n/a OR _____

**P:** Next session date: _1600_ time: _15 MAY 2019_

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | supportive ly | 2 |
| ↑ Problem solving | '' '' '' | 3 |

1-Significantly improved 2-Somewhat Improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

Intake Note

**S:** Date of intake: 26 APR 2019   Time of intake: 16D -- 17D0   Client: George Clark

Therapist and client reviewed intake paperwork. Client was given Notice of Privacy Practices (NPP), Policies and Information (P&I) and Consent to Treatment (CT) forms. Client agreed to proceed with intake, acknowledged receipt of the above information, voiced understanding and signed NPP, P&I and CT forms.

Presenting complaint:

"Incident happened 5 years ago)
supervisor tried to fire me then, threatened
lied about CT, filed grievances, supervisor
moved, new supervisor transferred back in
and supervisor once again.

Psychiatric hx: Family counseling 5 years ago
during work stressor, somewhat helpful

Medical hx: Prostate cancer in remission, hernia, HTN
takes Lisinopril

Family psychiatric hx: Denied

Family medical hx: Denied

Social hx (drugs, ETOH, caffeine, nicotine): Coffee daily, 1 24 oz beer
2-3 weeks

Developmental hx: Arkansas, Little varied by (M) (P)
(F) passed away, (M) still living, lived in CA
21 years, some college, worked for state
last 15 years, Denied physical, Emotional
or sexual h, hobby Basketball nobles

Relationship hx: Married x 2, divorced, 3rd current
(W) 27 years good relationship

Intake Note

Occupational/educational and financial hx: _Some college, working for_ _state problems + supervisor, 18yrs in_ _state job_

**O:** Ct. presented well-groomed and appropriately dressed? ✓. Normal speech and motor activity? ✓. Affect and mood congruent? ✓. SM denied / ENDORSED current SI/HI. Thought content WNL? ✓ Thought process was linear and goal-directed? ✓. Insight and judgment intact? ✗ Other observations: _N/A_

**A: Warning signs (circle):** ~~current SI, current HI, access to means,~~ (anxiety), anger, agitation, (insomnia), ~~increased A&D, loss, giving away belongings, impulsivity, no perceived reason for living, no sense of purpose, seeking access to means, isolation,~~ Other: _N/A_

Current/static risk factors (circle): ~~thwarted belongingness, perceived burdensomeness, acquired capability for suicide, domestic violence, substance abuse, legal problems, financial problems,~~ lack of social supports, ~~hx of SI, hx inpatient psych, hx of suicide attempts, family hx of suicide/suicide attempts, hx of mental illness, hx of NSSI,~~ (male), ~~hx of domestic violence, hx of substance abuse, hx of trauma/abuse,~~ (over 50 y/o,) Other: ✓ _N/A_

Current protective factors (circle): (denies current SI), (denies past SI), (denies attempts), (denies family hx of suicide) (good social support), (intimate partner), (children), (religion)/spirituality, (help-seeking) behavior, motivation to change, (medication compliance,) ~~collaborated in treatment planning, collaborated in Crisis Response Planning,~~ (future orientation,) (means restriction,) Other—

Current risk for suicide (circle one): 1.(Not currently at) clinically significant risk / 2. ~~Currently at clinically significant risk, but NOT imminent / 3. Currently at clinically significant risk, IMMINENT~~

Diagnostic Formulation: _Ct experiencing difficulty @ work_ _due to being supervised by previous supervisor who_ _created a hostile working environment in the past._

Diagnoses: _Other problem related to employment_

**P:** Next session date: _07 MAY 2019_ time: _1600_

| Treatment goals: | Intervention(s): | Progress: |
|---|---|---|
| ↓ Anxiety | Supportive counseling | N/A |
| ↑ problem solving | " " | N/A |

1-Significantly improved 2-Somewhat improved 3-No change 4-Somewhat worse 5-Significantly worse C-Completed D-Dropped

Jentry E. Tillman, LCSW, BCD, MAC
Paladin Counseling Services, LLC

III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the
facts showing that each plaintiff is entitled to the injunction or other relief sought. State how each defendant
was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights,
including the dates and places of that involvement or conduct. If more than one claim is asserted, number each
claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if
needed.

A.   Where did the events giving rise to your claim(s) occur? Arkansas Youth Challenge Program
( Camp Robinson ). Christopher Scott Stanger ( Director of Human Resource
Let Hugh Leavell discriminated and harass me, once again.

B.   What date and approximate time did the events giving rise to your claim(s) occur?
1/30/19 12:40 pm - E-mailed concerns of Supervisor Hugh Leavell.
5/13/19 10:14 - meeting with staff members Hugh Leavell state the past is the past
7/26/19 12:11 - Supervisor Irate because I had a dentist appointment the
same date of a Youth Challenge Cadet. My son appointment is first.
7/24/19 11:47 am - Explained situation of my child's appointment.
7/26/19 1:44 pm - Supervisor Leavell Knocked on viciously, Hostile on my cubicle

C.   What are the facts underlying your claim(s)? (For example: What happened to you? Who did what?
Was anyone else involved? Who else saw what happened?)
EEOC gave me to sue letter for Retaliation and discrimination.

- Another staff Christina Raatz wore Tennis shoes on several occasions
No write up from Supervisor Hugh Leavell. I had a foot injury one
day and got wrote up. Christopher Stanger I should have went to the
doctor ( White female)
- Todd Nordwrth ( white male ) loudly refused one of Supervisor Leavell
No write up from Supervisor Leavell.
Ms. Fletch Berkley, Ms. Carmen Edwards and Chisty Raats
witness Hugh Leavell Knocking hard several time on my cubical    July 26,

IV.   Irreparable Injury

Explain why monetary damages at a later time would not adequately compensate you for the injuries you
sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation
could not be measured. Because of the mental Anguish and Therapy, which
was need for my sanity. This could be avoided, if Human Resources
Christopher Stanger and Director Joe Miller would have search past
records. I have submitted transcripts from 2013 and 2014, that
show Hugh Leavell try to show me and co-worker Fletcher Berkley porn-
phy, threatenime with guns, and trying to write me up for not
I was hospitalize for five days. This transcripts will show the disparate
treatment. ( Court document) Hugh Leavell wrote me up for insubordation &
in appropriate conduct, which affect my salary

I have worked at Youth Challenge for sixteen years. I have
witness other employees with less year 4 and 5 year make more
moneys.

Clark, George R NFG NG ARARNG (USA)        *Directorate of State Resources*

*(501) 212-5167*

| | |
|---|---|
| **From:** | Clark, George R NFG NG ARARNG (USA) |
| **Sent:** | Wednesday, January 30, 2019 12:40 PM |
| **To:** | Mallett, Joe NFG NG ARANG (US) |
| **Cc:** | Ward, Billy J NFG (USA); Stanger, Christopher S NFG NG ARARNG (USA) |
| **Subject:** | Concerns at Arkansas Youth Challenge Program |

*After sending E-mail to Mr. Stanger, Mr. Mallett and Mr. Ward. Mr. Mallett and I went to Mr. Stanger office, the first words came out his mouth "You know how to get somebody attention. I replied to him "I'm trying to protect myself. Mr. Stanger once again said to me. "You know how to get some attention.*

Good morning Mr. Mallett,

　　　　　　Thank you for meeting with me this morning  and my concerns with the moving of departments.  There will  be a problem with being supervised under  Mr. Hugh  Leavell.  The documents I shared  with you this morning stated facts.

　　　　　　Mr. Hugh Leavell and Mrs. Regina Ealy were moved from Post Residential Office. The panel  from the hearing proceeding suggested they created a hostile environment and other violations, not being professional in leadership roles.

　　　　　　My other concern is the following,  hiring a past employee, which was suspended for about three weeks. ( Mrs. Valarie Robinson) She was suspended for trying to fight another employee. As a supervisor, Mrs. Robinson also created hostile  working environment

　　　　　　And other violations.  In accordance  with TAG Conduct Policy 2011-04, all YC staff

　　　　　　Members are prohibited from the following  activities:  h) Actual or attempted physical violence or coercion either implied or explicit towards anyone at any time or place related to employment issue or while on duty or any time on  ARNGYCP

　　　　　　Premises.  Also, Mr. Hugh Leavell in the past  have violated this policy by threatening me  with a gun on several occasion. This incident was witness by other employees and the documents were revealed in hearing proceedings.

　　　　　　Sincerely

　　　　　　Mr. George R. Clark III

*He (Mr. Stanger) said we moving forward and I need to get on board. This is new management and we moving forward.*

**Clark, George R NFG NG ARARNG (USA)**

| | |
|---|---|
| **From:** | Leavell, Hugh R NFG (US) |
| **Sent:** | Monday, May 13, 2019 10:14 AM |
| **To:** | Berkley, Fletcher L NFG NG ARARNG (US); Clark, George R NFG NG ARARNG (USA); Clemons, Linda R NFG NG ARARNG (US); Dabic, Slavica NFG (US); Edwards, Carmen D NFG (USA); Hall, Harold L NFG NG ARARNG (USA); Nodurfth, Todd C NFG (US); Raatz, Christina A NFG (USA); Robinson, Valerie R NFG NG ARARNG (USA); Williams, Christopher A NFG NG ARARNG (USA) |
| **Subject:** | STAFF MEETING |

There will be a RPM Staff Meeting tomorrow at 0830 hours..............

Hugh Leavell
Community Outreach Director
Desk:  501-212-5304
Fax:  501-212-5519
aryouthchallenge.com

5/13/19  During the meeting, Mr. Leavell hit the table with his hand so loud. He (Mr. Leavell) stated " I can't take that back, the past is the past. Mr. Leavell also stated we need to move on from that.

5/14/19 Mr. Leavell stated at another staff meeting it's Hostile in this office. If you got a problem with me come talked to me. Everybody supervise differently.

1

## Clark, George R NFG NG ARARNG (USA)

| | |
|---|---|
| **From:** | Leavell, Hugh R NFG (US) |
| **Sent:** | Friday, July 26, 2019 12:11 PM |
| **To:** | Clark, George R NFG NG ARARNG (USA); Mallett, Joe NFG NG ARANG (US) |
| **Cc:** | Ward, Billy J NFG (USA); Davis, Chynethia D NFG (USA) |
| **Subject:** | RE: My Response (UNCLASSIFIED) |

**Classification:**          UNCLASSIFIED

CLASSIFICATION: UNCLASSIFIED

FYI.......... I was asked to support the appointments.  Whenever another department needs help and we can help, we will help.  I have receive no request for time off for Mr. Clark.  Supporting other departments whenever needed will be ongoing. This will fall under other duties as assigned.  I don't expect every lawful task assigned to be questioned.  When the email was received to provide support, it asked to 2 drivers.  Mr. Chris Williams received one of the support missions on yesterday and Mr. Clark was assigned the other one on Monday. Mr. Hall and Mr. Todd was off when the assignments were given. Mr. Williams concluded his mission without complaint or issues or incident. That type of spirit of cooperation is what I expect from all my employees. Because I have not received any prior request for leave, if Mr. Clark does not perform this task, I will require a doctor's note upon his return to work.

-----Original Message-----
From: Clark, George R NFG NG ARARNG (USA)
Sent: Friday, July 26, 2019 11:47 AM
To: Mallett, Joe NFG NG ARANG (US) <joe.mallett.nfg@mail.mil>
Cc: Leavell, Hugh R NFG (US) <hugh.r.leavell.nfg@mail.mil>; Ward, Billy J NFG (USA) <billy.j.ward12.nfg@mail.mil>; Davis, Chynethia D NFG (USA) <chynethia.d.davis.nfg@mail.mil>
Subject: My Response (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

   Mr. Mallet,                                        7/26/2019
      My concerns are taking cadets to medical appointments, while Arkansas Youth Challenge have employed two nurses on staff for these job duties.
   Could you explain, how the Community Outreach Director (Hugh Leavell) is over The medical department, with assigning Post Residential staff with appointments.
      I am not authorize to sign parental documents for children, while they are In Youth Challenge. The nurses and the parents are responsible for medical appointments and issues.
The nurses should coordinate with Operation's staff for future appointments.
         My goals at Youth Challenge is help to change the lives of at risk Children of Arkansas. I prefer not to know the medical issues of the cadets.
I do not want to be under HIPAA law or violations. Also, I wish not to be bias toward Youth Challenge cadets because of their medical issues. Consider these factors.
Also , one of my children has a dental appointment at 9:30 am on July 29, 2019. I will be taking my son to his dental appointment.

Thank you
George R Clark III
CLASSIFICATION: UNCLASSIFIED

see back of page

1

## Clark, George R NFG NG ARARNG (USA)

| | |
|---|---|
| **From:** | Mallett, Joe NFG NG ARANG (US) |
| **Sent:** | Friday, July 26, 2019 1:09 PM |
| **To:** | Clark, George R NFG NG ARARNG (USA) |
| **Cc:** | Leavell, Hugh R NFG (US); Ward, Billy J CSM USARMY NG ARANG (USA) |
| **Subject:** | phone call |

Mr. Clark,

Per your phone call I stopped to check my email. I understand your need to take your son to the dentist Monday. Regarding your concerns both of our Nurses do transport cadets unless the appointments are too numerous for them to do this and to do sick call, meds, and all the other daily things needed to support the cadets. Then we (Administration) reach out to other (all) departments for transport or additional support as needed. You never are tasked with any medical decisions just transport and bring back any paperwork for the nurses to record. We balance assignments out by who is here on that specific work day and try not to hit just 1 or 2 employees.

I appreciate your concern and efforts to help all cadets.

Had you filled out your leave request? This is another thing we look at to determine assignments for transport to avoid conflicts for each staff member.

I hope your son's dentist visit goes well.

Thank you.

JM


V/R


Joe Mallett
Director
ARNG Youth Challenge
Phone 501-212-5344
Fax 501-212-5339
www.youthchallenge.com

1

 

9/18/13

I disagree with General Klemmer's reply to my grievance and I request that my grievance to be forward to step 3.  Please read the following reasons:

1.  I am an African American Male in which I am in the protective category of the Title 7 of Civil Rights Act of 1964.  I have experienced discrimination, disparate treatment and disparate impact by my immediate and 2nd level supervisors.  The discrimination policy outlined in my handbook and in the federal laws has been broken.

2.  I have experienced a hostile working environment in which the workplace violence policy, conduct policy and code of ethics outlined in my handbook have been broken.

3.  General Klemmer's findings did show some violations, and the evidence that I provided him was not thoroughly reviewed and not taken seriously.  In my review with General Klemmer he stated that my grievance was filed because of my performance evaluation, however I did not mention my performance evaluation rating.  I have provided proof to support my claim and it was ignored.

Basically what I am experiencing is that the Arkansas National Guard and the Military Department allows and condones discriminatory practices, hostile working environment and fraud.   Overall my environment is still hostile and I have experienced retaliation since my performance evaluation appeal hearing and also during this grievance process.

George Clark

George Clark



IN .B

## Clark, George R NFG NG ARARNG (USA)

| | |
|---|---|
| **From:** | Clark, George R NFG NG ARARNG (USA) |
| **Sent:** | Friday, July 26, 2019 1:44 PM |
| **To:** | Mallett, Joe NFG NG ARANG (US) |
| **Subject:** | RE: phone call (UNCLASSIFIED) |
| | |
| **Classification:** | UNCLASSIFIED |

CLASSIFICATION: UNCLASSIFIED


Mr. Mallet,

Thanks for confirming my son dentist appointment over the phone, with the dentist office. I will be available for future

Appointments.  I forgot that my son's appointment was on the date of July 29, 2019.  Mr. Leavell  didn't give me a chance to put in my request.

He just knock on my cubical several time, being loud,  Hostile and ignorant.  Will you please address Mr. Leavell actions toward me.


-----Original Message-----
From: Mallett, Joe NFG NG ARANG (US)
Sent: Friday, July 26, 2019 1:09 PM
To: Clark, George R NFG NG ARARNG (USA) <george.r.clark78.nfg@mail.mil>
Cc: Leavell, Hugh R NFG (US) <hugh.r.leavell.nfg@mail.mil>; Ward, Billy J CSM USARMY NG ARANG (USA) <billy.j.ward12.mil@mail.mil>
Subject: phone call

Mr. Clark,
Per your phone call I stopped to check my email. I understand your need to take your son to the dentist Monday. Regarding your concerns both of our Nurses do transport cadets unless the appointments are too numerous for them to do this and to do sick call, meds, and all the other daily things needed to support the cadets. Then we (Administration) reach out to other (all) departments for transport or additional support as needed. You never are tasked with any medical decisions just transport and bring back any paperwork for the nurses to record. We balance assignments out by who is here on that specific work day and try not to hit just 1 or 2 employees.
I appreciate your concern and efforts to help all cadets.
Had you filled out your leave request? This is another thing we look at to determine assignments for transport to avoid conflicts for each staff member.
I hope your son's dentist visit goes well.
Thank you.

JM


V/R


Joe Mallett

A
RECEIVED
SEP 1 0 2019
U.S. EEOC
LRAO

From George Clark, Vicki Huggens # 493-2019-01328

9/4/19   Supervisor Mr. Leavell got into a confrentation with a co worker Ms. Dabic in our office. The two were very loud arguring with each other. Ms. Dabic wasn't verbally warned or no write up for her actions. (White Female)

9/6/19

Another co worker Mr. Todd Nordurfth complained to Mr. Mallett (Director) about the e-mail Mr. Leavell about employee leaving their work area. Mr. Leavell wanted everyone to e mail him, when leaving their desk.

Mr Todd Nordurfth didn't go to Mr. Leavell's Supervisor (Mr. Ward). Mr. Todd Nordurfth complained to the Director that he couldn't sleep because of the e mail from Mr. Leavell. Mr. Todd Nordurfth didn't get wrote up for breaking the chian of commad.

I was written up for not following chian of command. I was going to see Mr. Ward, but he was on vacation that day.

Mr. Todd Nordurth is a white male.

*Trying to terminate me*

## Directorate of State Resources
### DSR Human Resources
### Employee Counseling / Action Summary

| Employee: George Clark | | | EMPL ID: 47485 |
|---|---|---|---|
| Supervisor: Hugh Leavell (PN: 72616) | | Date of violation: July 26, 2019 | Date of warning: July 30, 2019 |
| Is the employee in a probationary period? ☐Yes ☑No | | | |
| Is the employee in a temporary appointment? ☐Yes ☑No | | | |

| Have there been previous warnings? ☑Yes ☐No | | Check all that apply. | |
|---|---|---|---|
| Disciplinary Action | Date(s) | Briefly describe the nature of the inappropriate behavior. | |
| ☑Verbal warning | 06/04/2019 | Employee reported to work out of compliance with YCP dress code in jeans and tennis shoes, he was asked to come to the office for counseling and the employee refused and instead went to speak with the Director. Violating Department of the Military's Chain of Command Policy (DOTM Policy Handbook pg. 6). Also violating DOTM Uniform Code of Conduct Policy Group 2 (a.) Refusal to follow Section Managers instructions, perform assigned work, or otherwise comply with established written policy. (c.) Use of Obscene or abusive language, (e) Disruptive Behaviors | |
| ☑Written warning* | 07/26/2019 | Violation of the following policies: EASE Policy (DOTM Policy Manual pg. 14), Chain of Command Policy, (DOTM Policy Handbook pg. 6) Refusal to follow Section Managers instructions, perform assigned work, or otherwise comply with established written policy. | |
| ☐Decision making leave* | | | |
| ☐Termination* | | | |

**Nature of the current violation. Provide the facts. Describe in detail below, on back, or attach a sheet.**

| | | | |
|---|---|---|---|
| ☐Substandard Work | ☐Tardiness | ☐Carelessness | ☐Theft |
| ☑Insubordination | ☐Harassing others | ☐Violence | ☐Other: Unprofessionalism |
| ☑Inappropriate Conduct | ☐Dishonesty | ☐Absenteeism | ☐Violation: EASE Policy |

**Describe the violation:** Mr. Clark was given an assignment on July 26th to transport students to a medical appointment; however instead of Mr. Clark voicing his concerns to his immediate supervisor, he chose to voice this in an email. He sent an email to the YCP Director writing his concerns, and explaining why he did not want to perform the duty assigned to him. (Violation: Chain of Command Policy noted above) & (Failure to Follow Sections Manager's Instructions) Mr. Clarks also stated in his email that he had a dental appointment scheduled for his child on July 29th, however Mr. Clark had not submitted a sick leave request to Mr. Leavell for prior approval nor had a verbal discussion been had. Violation (Leave Ease Policy noted above) Not receiving prior approval for ALL leave. Later that day Mr. Leavell had an impromptu meeting that was informal and everyone was asked to remain at their workstations but was in ear-shot of the message. When Mr. Leavell asked Mr. Clark did he get all that he was saying, Mr. Clark never responded or acknowledged Mr. Clark, which prompted Mr. Leavell to ask him several times "did he hear him?" Mr. Clark never responded finally Mr. Leavell knocked on his cubical door and yet he never responded Mr. Leavell tried to open the door but Mr. Clark had it locked and never got up to open the door. The result of this disruptive behavior (Violation of Uniform Code of Conduct (e.) which unfortunately led to Mr. Leavell being unable to continue the meeting with the staff. There are several affidavits from Mr. Clarks' co-workers stating they witnessed this disruptive behavior that occurred on this day, they will be attached.

July 26, 2019 @1:44pm an email was forwarded to the director Joe Mallet from Mr. Clark, stating that Mr. Clark did not give him ample time to put in a leave request. Mr. Clark was very disrespectful and displayed insubordinate and unprofessional behavior by calling Mr. Leavell Hostile and Ignorant in his email and again here he is in violation of Chain of Command Policy/Procedure by not reporting his concerns to Mr. Ward, who is Mr. Leavells' supervisor. If Mr. Clark had an issue with Mr. Leavell, he should have reported this to Mr. Ward. Violation of YCP SOP: Responsibilities to Colleagues: 1) Staff members will treat colleagues with respect, courtesy, fairness, and good faith. 2) Staff shall behave in a professional manner in all work-related contacts.





**MILITARY DEPARTMENT OF ARKANSAS**
**DIRECTORATE OF STATE RESOURCES**
**BUILDING 4201, CAMP J.T. ROBINSON**
**NORTH LITTLE ROCK, ARKANSAS 72199-9600**

DSR                                                                        November 14, 2013

MEMORANDUM FOR THE ADJUTANT GENERAL, ARKANSAS ARMY NATIONAL
GUARD, BUILDING 6000, ROBINSON MANEUVER TRAINING CENTER, NORTH
LITTLE ROCK, AR 72199-9600

SUBJECT: Internal Grievance Review Committee recommendations under Step 3, Option 2 for
Grievance Case File 08-29-13. Grievant – Mr. George Clark.

1. The Committee is providing recommendations to The Adjutant General regarding Mr. George
Clark's allegations of gender discrimination, favoritism, harassment, hostile work environment,
and code of ethics violations at the Arkansas National Guard Youth Challenge Program (YCP).
Mr. Clark is a Career Planner and Placement Specialist at YCP. Mr. Clark filed the grievance
against his immediate supervisor, Post Residential Supervisor Regina Ealy, and his second level
supervisor, Deputy Director Hugh Leavell.

   a. Mr. Clark provided the Committee with the following exhibits:

      (1) Policy Memorandum No. 2009-13, Workplace Violence Policy

      (2) The Adjutant General's Policy 2011-4, Conduct

      (3) Three exhibits to support allegations of Ms. Ealy's tardiness, failure to complete
tracking matrices, and code of ethics violations

      (4) Excerpts from the State Military Department Employee Handbook

      (5) Policy Memorandum No. 2009-10, Discrimination and Sexual Harassment

      (6) Military Department Anti-Fraud and Code of Ethics Policy dated October 1, 2005

      (7) A copy of the YCP Post-Residential Personnel Monthly Counseling form

      (8) Three exhibits providing supporting medical information for Mr. Clark's allegations.



e.   Remediation:

1)   The Youth Challenge Director conduct an audit of the post-residential tracking system, conduct retraining, and direct Mr. Leavell to conduct periodic audits to ensure compliance with the program.

2)   The Youth Challenge Director will counsel Mr. Leavell on the State Military Department work attendance policy and ensure it is properly executed to include the correct use of compensatory time.

3)   Mr. Leavell will counsel Ms. Ealy on the work attendance policy and The Adjutant General's policy on personal conduct to include use of profanity in the workplace.

Assistant Director's Signature: _____          Date:  _16 SEP 13_

Employee Answer:

☐     I accept the answer to my grievance.

☑     I do not accept the answer to my grievance and will refer it to the next step.

Note:  Explain fully why you do not accept the above response/decision.

Grievant's Signature: _____

Date:  _9/18/13_

DSR

SUBJECT: Internal Grievance Review Committee recommendations under Step 3, Option 2 for Grievance Case File 08-29-13. Grievant – Mr. George Clark.

e. Three YCP employees testified they witnessed Ms. Ealy using profanity and racial slurs in the workplace. Ms. Ealy denied the allegations.

f. Ms. Ealy testified that she has not engaged Mr. Clark and that she has not taken steps to improve their working relationship. Per her testimony, she "steers clear" of Mr. Clark.

g. Career Planning Specialist at YCP, Nancy Moore, testified that in October 2013, prior to a scheduled inspection, someone manipulated her files to back log data not previously entered. The missing data pre-dated Ms. Moore's hiring at YCP. According to Ms. Moore, the back filled data was in Ms. Ealy's handwriting. Testimony from Ms. Moore's co-workers indicated that she is precise in her record keeping and an outstanding employee. The Committee found Ms. Moore's allegation credible.

h. In October 2013, Ms. Ealy refused to turn over requested records to DSR. Testimony showed that Ms. Ealy acted in a belligerent and disruptive manner. She finally capitulated when Mr. LaBoy ordered her to provide DSR with the records.

i. Mr. Leavell instituted a Post Residential Personnel Monthly Counseling form. Mr. Leavell did not recognize the form when the Committee presented it to him. Upon further reflection, Mr. Leavell confirmed he instituted the use of the form in 2012, though testimony from multiple employees indicated that they had only two monthly evaluations beginning in September 2013. The form is not based on job standards and the copy presented to the committee for Mr. Clark was not signed (by employee or supervisor), dated, or coded in any way to specify the subject of the evaluation.

(1) The Post Residential Personnel Monthly Counseling form lacks the information necessary to link the evaluation to any specific employee or supervisor, thereby rendering it useless. Additionally, employees find the monthly counseling form to be retaliatory and testimony clearly showed it is bad for morale.

(2) The information gathered on the Post Residential Personnel Monthly Counseling form should be confidential, a task made more difficult by the lack of information regarding a specific employee or supervisor.

j. The Committee makes the following recommendations to the Adjutant General.

a. The Committee recommends the removal or reassignment of Mr. Hugh Leavell. Testimony showed that Mr. Leavell has engaged in inappropriate, harassing, and threatening behavior, resulting in a hostile work environment at the YCP. He has shown little regard for employees under his span of control. The result of this disregard is poor performance, low morale, and job

DSR

SUBJECT: Internal Grievance Review Committee recommendations under Step 3, Option 2 for Grievance Case File 08-29-13. Grievant – Mr. George Clark.

dissatisfaction. Mr. Leavell currently appears to be the source of many problems at YCP and without his disruptive presence the Committee believes YCP can flourish. Aside from Post Residential Supervisor Regina Ealy and Deputy Director Hugh Leavell, the YCP employees displayed considerable organizational cohesion and a deep commitment to their jobs.

b. All supervisors should complete the required supervisory training. Mr. Leavell confirmed that although he has been the Deputy Director for approximately one year, he has not completed the training and did not even know if he had the Supervisor's Handbook for reference. Additionally, supervisors should complete all other available training.

c. Discontinuing the Post Residential Personnel Monthly Counseling form will mitigate the adversarial relationship between supervisors and employees. If a monthly review is approved by the YCP Director, the Committee recommends that the evaluations be based on specific job standards as outlined in the State Employee Performance Evaluation Subordinate Form (DSR-Per Form S E 101).

d. The YCP Director should enforce the standing policies regarding tardiness. Differential enforcement disrupts the work environment and leads to the perception of favoritism.

e. DSR should develop State Employee Discipline and Adverse Actions procedures to include a table of Penalties. Once developed, include the guidance in the Supervisory Training Course.

8. The Internal Grievance Review Committee members are below.

Eric Mills
Committee Chairperson

Sandra Nichols
Committee Member

Latrina Dupins
Committee Member

 

DSR
SUBJECT: Internal Grievance Review Committee recommendations under Step 3, Option 2 for
Grievance Case File 08-29-13. Grievant – Mr. George Clark.



    b. At the request of the Committee, the Grievance Officer provided members the fiscal year
2012 Arkansas Military Department, Directorate of State Resources, State Employee
Performance Evaluation Subordinate Forms for Regina Ealy and George Clark.

2. The Committee heard testimony on November 8, 2013 from George Clark and nine witnesses:
Richard LaBoy, Hugh Leavell, Regina Ealy, Fletcher Berkley, Nancy Moore, Ricky Buchanan,
Kristie Bragg, Deborah Russell, and DeMarcus Foreman.

3. The Committee found no evidence in the Step 1 Grievance Form, or from testimony, to
substantiate the claim of gender discrimination or favoritism by Regina Ealy or Hugh Leavell.

4. The Committee found no evidence in the Step 1 Grievance Form, or from testimony, to
substantiate the claim of harassment by Regina Ealy or Hugh Leavell on the following claims:

    a. The Committee confirmed that approximately three year ago, Mr. Leavell requested, on at
least one occasion, that co-workers rub his back, as alleged in the Step 1 Grievance Form.
However, testimony revealed that the request was not sexual in nature and, though inappropriate,
does not meet the definition of sexual harassment as defined by the U.S. Equal Employment
Opportunity Commission or The Adjutant General's Policy 2013-13, Prevention of Unlawful
Discrimination and Sexual Harassment.

    b. The Committee received testimony from one witness that corroborated the allegation stated
in the Step 1 Grievance Form that approximately three year ago, Mr. Leavell asked co-workers
to view pornography on his telephone while on work related travel. Mr. Leavell did not recall the
incident. The Committee concluded the incident may meet the definition of sexual harassment as
defined by the U.S. Equal Employment Opportunity Commission and the The Adjutant
General's Policy 2013-13, Prevention of Unlawful Discrimination and Sexual Harassment.
However, testimony indicated the incident was isolated and that no discriminatory action
resulted from the refusal to participate. There is no indication that a supervisor was notified
regarding the incident.

    c. The Committee received testimony from one witness that corroborated the allegation stated
in the Step 1 Grievance Form that approximately three year ago, Mr. Leavell threatened to "use
his gun" on Mr. Clark. Mr. Leavell did not recall the incident. Testimony supported the
contention that Mr. Clark notified Mr. Leavell's supervisor at the time, Mr. Johnny Coley. By all
accounts the behavior ceased after the notification of Mr. Coley. The alleged incident does meet
the definition of workplace violence as stated in The Adjutant General's Policy 2013-12,
Workplace Violence Policy. However, testimony revealed that the behavior, though
inappropriate, was most likely a jocular incident that escalated to the point of offending Mr.
Clark. Without further documentation by the supervisory chain at YCP, the Committee cannot
make a determination regarding a violation of the Workplace Violence Policy.

 

DSR
SUBJECT: Internal Grievance Review Committee recommendations under Step 3, Option 2 for
Grievance Case File 08-29-13. Grievant – Mr. George Clark.

5. The Committee found evidence of harassment by Mr. Leavell with regard to Mr. Clark's
medical condition.

    a. In May 2013, Mr. Clark provided a signed and dated note from his doctor to Mr. Leavell.
The note specified medical restrictions that prohibited Mr. Clark from undertaking prolonged air
travel.

    b. Despite adequate medical documentation, as supported by Directorate of State Resources
(DSR) personnel, testimony supported the allegation that Mr. Leavell continued to press Mr.
Clark to attend a training event in New Hampshire. Additionally, Mr. Clark refused certain
duties at YCP based on his medical condition. This conflict resulted in an oral warning by Mr.
Leavell. DSR concluded that Mr. Leavell could not formally reprimand Mr. Clark because the
refusal of duty stemmed from a medical issue.

    c. Testimony supported the allegation in the Step 1 Grievance Form that Mr. Leavell
threatened Mr. Clark with reassignment and possibly termination based on the disagreements
arising from medical issues. The Committee found Mr. Leavell to be in violation of The Adjutant
General's Policy 2013-08, Equal Employment Opportunity.

6. The Committee found evidence in the Step 1 Grievance Form and from testimony to
substantiate the claim of a hostile work environment at YCP propagated by Regina Ealy and
Hugh Leavell. Witness testimony exposed an environment rife with tension, intimidation,
threats, Military Code of Ethics violations, poor communication, and a lack of leadership below
the level of the Director.

    a. Mr. Laboy testified that everybody complains about Mr. Leavell's behavior to him.

    b. Testimony revealed that Mr. Leavell told Mr. Berkley he wanted to give him a rating of
"exceeds standards" on the fiscal year 2012 annual performance evaluation. However, Mr.
Leavell told Mr. Berkley that he could not do this because of Mr. Clark's evaluation. According
to Mr. Berkley, Mr. Leavell did not provide any further explanation.

    c. Five YCP employees confirmed that at a September 2013 meeting, Mr. Leavell told his
staff that if they felt they worked in a hostile environment they could resign or quit coming to
work.

    d. The YCP Nurse, Deborah Russell, testified that when she requested a student be removed
from class so that she could examine him due to his complaint of chest pain, Mr. Leavell, as
Acting Director, told her, "you better go about your job while you still have one." According to
Ms. Russell, she asked Mr. Leavell if that was a threat and he responded that it was a promise.

# MDA- EMPLOYEE POLICY STATEMENT
## MILITARY DEPARTMENT GRIEVANCE PROCEDURE



Step 1

Grievance Form

This form is to be used by the employee in filing a formal grievance. The form will be filled in completely and will serve, without amendment, as the source document for the grievance process. All supporting documentation must be attached to this grievance form.

EMPLOYEE'S NAME: GEORGE CLARK   JOB TITLE: CAREER PLANNER AND PLACEMENT SPECIALIST
IMMEDIATE SUPERVISOR'S NAME: REGINA EALY
EMPLOYEE'S WORK LOCATION: YOUTH CHALLENGE
SHIFT HOURS: 0700-1530   PHONE #: 212-5325

Grievance Statement

In order for a formal grievance to be processed, the following four (4) elements must be addressed: (Attach Additional Pages If Needed)

(1) What was the date of occurrence and what specific behavior, condition or violation of policy or procedure occurred which you consider constitutes a grievance?

I am filing a grievance against my immediate supervisor Mrs. Regina Ealy and my second level supervisor Mr. Hugh Leavell based on the following areas:

Gender Discrimination –Favoritism, Harassment, Hostile Working Environment and several violations of the code of ethics.

I am a Career Planner and Placement Specialist for the Youth Challenge Program (YCP) and I have been employed since 2004. I have held two positions with YCP, cadre and my current position. My work location is in the Post Residential section. I am responsible for teaching classes to residential cadets and I am also responsible for 1 year follow-up case management services for cadets that exit our program. The Arkansas Military Department is an equal employment agency, however I am being treated differently.

Mr. Leavell threatened my employment. During my performance evaluation appeals meeting (in a mean and sarcastic tone) he told me that I had done enough to qualify for termination. I took offense because our meeting was supposed to have been about my job performance.

In the past me and Mr. Leavell has had our difference. Mr. Leavell has harassed me to provide him with my medical information and after fearing for my job I provided it to him and although I was under a doctor's order he continued to harass me. He called me in a meeting after receiving my doctors statement and demanded me to attend a training and if I didn't he was going to change my position at youth challenge.

Mr. Leavell and I also had a difference because I objected to rubbing his back, and also objected to looking at porn on his (Mr. Leavell) phone during a recruitment trip. Also I

gun on me on several occasions. (Mr. Fletcher Berkley can attest to these statements because he was a witness).

Mr. Leavell has shown a behavior of preferential treatment towards Mrs. Ealy in which he allows Mrs. Ealy to fraud the state of Arkansas by stealing time, also by not holding her accountable for work activities and allowing her to violate workplace violence policy and the conduct policy. Mrs. Ealy has been tardy or has missed work since her date of employment (please see exhibit A). I have documented evidence of Mrs. Ealy consistently having tardies and taking extended lunch hours, and she has not been written up for it. Mrs. Ealy has been allowed to change her own work hours to 0730-1600 to accommodate herself from being late.

Mrs. Ealy violated the code of ethics, page 82 conflict of interest, and 4th paragraph. Mrs. Ealy has done her school work during working duty hours on several occasions when she should be working on her case load.

In our work area we are required (Me, Ms. Moore, Mr. Berkley and Mrs. Ealy) to the utilize a spreadsheet for monthly updates. We all have access to the same spreadsheet so that our updates are on the same system. The standard is to complete the updates annually June – June and we also have tracking matrix on the front of the file folders for each student (see exhibit B). Exhibit B is a copy of my tracking matrix for class 38, in which I completed. Mrs. Ealy records in the system spreadsheet shows that she did not finish her caseload by standards and also Exhibit C show that Mrs. Ealy's tracking matrix is incomplete, this is evidence of her performance and how Mr. Leavell shows preferential treatment also.

Mrs. Ealy conduct is very unbecoming as a professional and as a supervisor. She uses profanity and racial slurs throughout the office (Bitch, Motherfucker, Ass and Nigga). After meeting with Mr. Laboy and Nurse Russell, Mrs. Ealy returned to our office mad and displayed negative behavior and threatened workplace violence, in her own words she said "If that Bitch put her finger in her face again she was going to Fuck her up" (Mrs. Ealy was referring to Nurse Russell).

(2) How have you been adversely affected by this grievance situation?

My environment is stressful and overwhelming at times. I've lost rest and my workplace has affected my family relationships because I am stressed. I fear for my job and I see that Mr. Leavell and Mrs. Ealy will do anything to make my work environment unpleasant. My supervisors have created a hostile working environment, favoritism and unfair treatment is allowed

(3) What specific action have you taken to reconcile and improve this situation, including discussing it with your immediate supervisor? What has been the outcome of these efforts?

My supervisors are part of the problem and are unapproachable, I am intimidated by them. They are aware of policies and procedures and they should follow them just like everyone else.




Step 2

Reply To Employee Grievance
DAG/Assistant Director

On 10 Sep 13, I met with Mr. George Clark (Grievant), and Ms. Da'Vetta Flowers (Grievance Officer) to hear Mr. Clark's grievance. During the discussion, Mr. Clark presented the four elements as per the State Military Department Grievance Policy. As the Assistant Director, I have conducted an inquiry concerning Mr. Clark's grievance and have made the following determinations:

a. Mr. Clark filed his grievance against his immediate supervisor, Ms. Regina Ealy and his second-level supervisor, Mr. Hugh Leavell. In the grievance, he claimed discrimination (based upon gender), favoritism, harassment, hostile working environment, and code of ethics violations.

b. Mr. Clark provided me with several exhibits to include:

   1) The Adjutant General's Policy 2011-04, Conduct.

   2) Policy Memorandum 2009-13, Workplace Violence Policy.

   3) Two exhibits containing evidence to validate his claims of workplace tardiness and failure to update tracking matrices.

c. In my investigation, I interviewed Mr. Leavell, Ms. Ealy, Mr. Berkley, and Ms. Moore. I interviewed each person in succession on 12 Sep 13.

d. Findings: Based upon the evidence provided and individual interviews, I have made the following findings:

   1) The preponderance of the evidence did not support findings of discrimination, favoritism, harassment, or a hostile working environment.

   2) I found that Mr. Leavell afforded Ms. Ealy a work schedule that lacked the necessary controls needed to prevent abuse. Ms. Ealy had several occasions of work tardiness as witnessed by multiple individuals within the office. *2 years worth of not Amending me*

   3) I found that Ms. Ealy did not update or close out her own tracking matrices for students enrolled in the post-residential system. If found that confusion existed as to how the tracking mechanism worked and overall awareness of the process. Additionally, it appeared that management did not have a good audit program to ensure compliance.

   4) I found that Ms. Ealy used profanity in the workplace and was confirmed by more than one coworker. I determined that this was a violation of The Adjutant General's policy dated 08 Mar 11, subject: *The Adjutant General's Policy 2011-04, Conduct.*

*Didn't Address racial slurs*

all employees with dignity and respect. That is the same expectation we have for employees in working with their supervisors.

b. Both Ms. Ealy and Mr. Leavell will be held accountable for their actions and be required to attend training on Constructive Conflict Resolution, Interpersonal Communication training, and the Supervisors Course.

c. Mr. George Clark is directed to attend Interpersonal Communications training to help alleviate tension within the workplace.

d. Mr. Leavell will receive a written warning, that will remain in the employee's DSR personnel file for a minimum of two (2) years, for failing to provide a work environment free of harassment and unprofessional leadership.

d. Ms. Ealy will receive a written warning, that will remain in the employee's DSR personnel file for a minimum of one (1) year for unprofessional conduct.

e. Mr. LaBoy will review the Post Residential Personnel Monthly counseling form to determine if it is of value to supervisors in managing and tracking the performance of employees. If it is determined to be an effective management tool it should be implemented throughout YCP, not just one section. If it proves not to be of value it will be discontinued.

f. The YCP Director will enforce the standing policies regarding attendance and tardiness throughout the program.

Freedom from harassment and hostile work environment will continue to be enforced throughout the workforce.

DIRECTOR'S SIGNATURE: _____ DATE: _26 Nov 13_

EMPLOYEE ANSWER:

_____ I accept the answer to my grievance.

___✓___ I do not accept the answer to my grievance and will refer it to the next step.

NOTE: EXPLAIN fully why you do not accept the above response/decision.

GRIEVANT'S SIGNATURE: _George R. Clark_

DATE: _12|4|13_

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 493-2019-01328 |

| null | | and EEOC |
|---|---|---|
| State or local Agency, if any | | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| Mr. George R Clark | (501) 442-1010 | 1961 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3907 Hillside Dr.,  NORTH LITTLE ROCK, AR 72118 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| ARKANSAS MILITARY DEPT. | 501+ | (501) 212-5300 |

| Street Address | City, State and ZIP Code |
|---|---|
| Camp J. T. Robinson Building 6000,  NORTH LITTLE ROCK,  AR 72199 | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|

| | Earliest | Latest |
|---|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | 01-30-2019 | 07-09-2019 |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | | |
| ☐ OTHER (Specify) | ☒ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired in September 2004, and my position is Case Manager. I have filed two previous charges for harassment. A grievance was held in 2014, resulting in the removal of my supervisor for harassment and creating a hostile work environment. I was informed on January 3, 2019, that he was being reassigned as my supervisor. I complained to the new HR about this during a meeting on January 30, 2019. Regardless, he was assigned effective May 22, 2019. He wrote me up for profanity, wearing jeans, and tennis shoes on June 5, 2019. A White coworker loudly refused one of his orders on May 24, 2019, and the supervisor told him he could have written him up for insubordination.

HR told me to get on board and stated I know how to get peoples attention. I was also told by the grievance officer I did not have to meet with my supervisor alone, but HR said I did.

I believe I have been subjected to a hostile work environment, harassment, discipline, additional job duties, and reassignment of my previous harasser in retaliation for filing previous complaints/EEOC charges. I also believe I was disciplined because of my race (Black); all in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct. | |
| Digitally signed by George Clark on 07-09-2019 04:41 PM EDT | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.



STEP 3

## REPLY TO EMPLOYEE GRIEVANCE
### Department Director

As the Department Director, I have reviewed the proceedings and recommendations of the Internal Grievance Review Committee, and conducted personal interviews concerning your grievances. My decisions for resolution of this grievance are listed below.

The Internal Grievance Review Committee (IGRC) addressed your allegations concerning gender discrimination, favoritism, harassment, hostile work environment, and code of ethics violations against your immediate supervisor, Ms. Regina Ealy, and your second-level supervisor, Mr. Hugh Leavell.

According to the IGRC report, the committee found no evidence in Step 1 Grievance Form, or from testimony, to substantiate the claim of gender discrimination or favoritism by Ms. Regina Ealy or Mr. Hugh Leavell.

The committee also found no evidence in the Step 1 Grievance Form, or from testimony to substantiate the claim of harassment by Ms. Regina Ealy or Mr. Hugh Leavell on several claims that occurred approximately three (3) years ago, and are outside the purview of this grievance. There was no indication that a supervisor was notified regarding the incidents at the time they occurred.

The IGRC did find evidence of harassment by Mr. Leavell with regard to your medical condition.

   a. Based on the information and testimony presented, it appears that one of the factors that contributes to the tension and poor working environment stems from your lack of cooperation with your supervisors. However, it must be recognized that your attitude toward your supervisors could possibly be attributed to ineffective leadership traits demonstrated by both Ms. Ealy and Mr. Leavell.

   b. The authoritarian leadership style used by Mr. Leavell, and failure to treat employees with professionalism, dignity, and respect, has had an adverse impact on morale and cohesion within the Administrative Branch of the Youth Challenge Program.

As Director of the Arkansas Military Department, I have weighed the information provided during each step of this grievance and the Internal Grievance Review Committee findings and recommendations. I have taken into consideration the actions you stated in Step 1 that would be required to remedy your grievance. The following actions are directed in order to enhance the effectiveness of Youth Challenge Program and to resolve your grievance, as requested.

   a. After careful review of your initial grievance and the IGRC report I have determined that there is a fine line between supervisors trying to hold employees accountable and harassment. And there is a fine line between authoritarian leadership traits and creating a hostile work environment. However, it is imperative that supervisors throughout the Arkansas Military Department conduct themselves as professionals and at all times treat

(4) What specific remedy do you request?

I want the Gender Discrimination, Harassment, Hostile Working Environment and the violations of the code of ethics to stop.  I want Mr. Leavell and Mrs. Ealy to be held accountable and reprimanded in accordance to our state and federal policy and procedures.

Employee's Signature: _George R. Clark_    Date: _8/29/13_

D10

Doctor's slip    I was hospitalize for 5 days for
Double Hernia

11

1    going to -- okay.  All right, next question.  Mr.

2    Clark makes a claim that -- he -- that he was required

3    to attend training despite being sick, and he provided

4    you with a doctors statement to that effect.  Did you

5    ever make him go to training even though he had a

6    doctors statement?

7        MR. LEAVELL:  This -- this -- this came out

8    during the -- his performance evaluation appeal --

9        GENERAL KLEMMER: Okay.

10       MR. LEAVELL:  -- panel and he brought that up and

11   he was referring to the document.  The doctor's

12   statement was brought up when I wanted him to go to

13   the barracks and supervise or do --

14       GENERAL KLEMMER:  Okay.

15       MR. LEAVELL:  -- you know, and do what Mr. Laboy

16   wanted done.  And he brought that out during then.

17   Now, that being said, there was a required -- the case

18   managers have to be certified every three years.

19       GENERAL KLEMMER:  Okay.

20       MR. LEAVELL:  We don't know when they're -- Mr.

21   Clark and another employee are two years out of

22   certification.  I had lobbied with Doing Mighty

23   Things, which is the contractor for training for the

24   Youth Challenge program right.

25       GENERAL KLEMMER: Uh-huh.



12

1      MR. LEAVELL:  Lobbied with them to get three

2    slots.

3      GENERAL KLEMMER:  Okay.

4      MR. LEAVELL:  You know, out of -- have 25 I think

5    they had.

6      GENERAL KLEMMER:  Yeah, and where was the

7    training at?

8      MR. LEAVELL: It's -- it was in Massachusetts?

9      GENERAL KLEMMER:  Okay.

10     MR. LEAVELL:  And before anything about anything

11   being sick, the first thing out of Mr. Clark's mouth

12   and another employee, was "I'm not going.  You can't

13   make me go, period."  I tried to get to the bottom of

14   why.  "I don't have --" first -- the first thing was

15   funds.  "I don't have the money to put up front to

16   go."

17     GENERAL KLEMMER: Okay.

18     MR. LEAVELL: So I lobbied with General Johnson

19   and anybody else, Colonel Heffling (phonetic) trying

20   to get funds to pay for their travel in advance so

21   they wouldn't have to.  That was approved.  Then, the

22   -- after that was approved, then I'm not going because

23   of these reasons.  And neither employee went to that

24   training.

25     GENERAL KLEMMER: Okay.  So you're saying that --

# LITTLE ROCK SURGICAL CLINIC
500 SOUTH UNIVERSITY - SUITE 317 LITTLE ROCK, ARKANSAS 72205
PHONE: (501) 664-2434

| Lance K. Burns, M.D. | Bobby D. Perry, M.D., F.A.C.S. | Lee C. Raley, M.D., F.A.C.R.S. | Kurtis S. Vinsant, M.D., |
|---|---|---|---|
| | Diplomat American Board of Surgery | Diplomat American Board of Surgery | Diplomat American Board of: |
| | | Diplomat American Board of Colon and Rectal Surgery | |

DATE: 4/16/13

Re: George Clark

Pt had surgery on 2/21/13 and has been cleared to return to work on SEE BELOW

Restrictions are as follows: Patient may not be able to tolerate long flights that may cause prolonged sitting due to minor pain from previous surgery.

Thank You

*[signature]* enner, LPN
Little Rock Surgical Clinic

WEARING depends underwear for leakage After surgery

13

1    it -- when you said he had -- he had to go, he

2    basically came back and said, well I don't want to go,

3    I'm not going to go.

4         MR. LEAVELL: Right.

5         GENERAL KLEMMER: And -- and then when pressed for

6    a reason, he said that I don't the money to front.

7         MR. LEAVELL: Right.

8         GENERAL KLEMMER: But when you get the money to

9    front, and he came back with the reason that --

10        MR. LEAVELL: Right.

11        GENERAL KLEMMER: -- said "I'm -- I've got a

12   doctors excuse, I can't go."

13        MR. LEAVELL: Correct.

14        GENERAL KLEMMER: Okay. Okay. And but -- did he

15   end up going?

16        MR. LEAVELL: Yeah.

17        GENERAL KLEMMER: Okay.

18        MR. LEAVELL: And to this day, they're not

19   certified.

20        GENERAL KLEMMER: Okay.

21        MR. LEAVELL: When I -- what I ended up -- I

22   ended up sending Ms. Ealy and Ms. Moore who had just

23   recently come on board.

24        GENERAL KLEMMER: Okay. He -- he mentions a

25   couple of -- a couple of things about Ms. Ealy and I'm

*Supervisor which was removed from office Building for Hostile working environment And Harrassing me*

**A**

## ARKANSAS STATE MILITARY DEPARTMENT

IN RE:   GEORGE CLARK GRIEVANCE
         FOLLOW-UP INTERVIEW SESSION

HUGH LEAVELL
September 12, 2013

**BUSHMAN COURT REPORTING**
620 WEST THIRD
SUITE 302
LITTLE ROCK, ARKANSAS 72201
**(501) 372-5115**

*bushmanreporting@aol.com*



1                    **P R O C E E D I N G S**

2          GRIEVANCE OFFICER:  Today is September 12, 2013.

3     In accordance with the Arkansas Military Department

4     Grievance Policy and Procedure, this is a follow-up

5     session pertaining to a grievance filed by Mr. George

6     Clark on August 29, 2013.  This session is a follow-up

7     session to obtain information pertaining to his

8     grievance.  Please state your name and your title for

9     the record.  I'm Da'Vetta Flowers, Grievance Officer,

10    and the time is 13:0200 hours.

11         MR. LEAVELL:  Hugh Leavell, Deputy Director Youth

12    Challenge.

13         GRIEVANCE OFFICER:  And you are the second-line

14    supervisor of Mr. George Clark?

15         MR. LEAVELL:  Yes, ma'am.

16         GENERAL KLEMMER:  Okay.  All right.  And I am

17    Brigadier General Keith Klemmer.  I'm the Deputy

18    Adjutant General for the Arkansas National Guard.

19    Okay. Mr. Leavell, I want to ask you a series of --

20    start off with fairly simple questions, and I'll get

21    into some more of the complex questions, but how long

22    have you actually been the deputy director at Youth

23    Challenge?

24         MR. LEAVELL:  Since last year and I can't give

25    you the exact date.

3

1       GENERAL KLEMMER:  And so about a year or so?

2   Okay, and how long have you been a state employee?

3       MR. LEAVELL:  For five years.

4       GENERAL KLEMMER:  Five years.  Okay.  You're --

5   describe your daily responsibilities and your duties;

6   what you do day to day.

7       MR. LEAVELL: Just supervise recruiting,

8       counseling, and post-residential (inaudible).

9       GENERAL KLEMMER:  Okay.  And how many people do

10  you have that work for you?

11      MR. LEAVELL:  Eight.

12      GENERAL KLEMMER: Okay.  And Mr. --

13      MR. LEAVELL: (inaudible)

14      GENERAL KLEMMER: Okay.  Okay.  Eight -- eight

15  direct reports?  Okay.  And -- Ms. Ealy is a direct

16  report of yours?

17      MR. LEAVELL: Yeah, I'm -- I'm just saying eight

18      people total falls in -

19      GENERAL KLEMMER: Total.  All falls up

20  underneath --

21      MR. LEAVELL: -- right.

22      GENERAL KLEMMER: -- including Mr. Clark and -

23      MR. LEAVELL: Yes.

24      GENERAL KLEMMER: -- Mrs. Ealy?  Okay.  All right.

25  How long have you worked with Mr. Clark?




4

1    MR. LEAVELL:  Since I've been there.

2    GENERAL KLEMMER: Okay.  So for five years?

3    MR. LEAVELL:  Uh-huh.

4    GENERAL KLEMMER:  Okay.  Has it always been

5    inside the counseling -- inside your current

6    assignment or -

7    MR. LEAVELL: No sir.  Just --

8    GENERAL KLEMMER:  Different departments?

9    MR. LEAVELL: Right.

10    GENERAL KLEMMER: Okay.

11    MR. LEAVELL:  Because I was originally hired as a

12    recruiter.

13    GENERAL KLEMMER: Okay.

14    MR. LEAVELL: And I was in a separate building and

15    then they put my office in the same office where the

16    PR was presently located.

17    GENERAL KLEMMER: Okay.  All right.  You -- you

18    may or may not be familiar with it but, I'll ask you;

19    are you -- are you aware/familiar with a tag

20    (phonetic) policy?  It's -- it's actually a number on

21    it, it's 2011-04 and it's called conduct.  Are you

22    familiar with that policy at all?

23    MR. LEAVELL:  Not directly sir.

24    GENERAL KLEMMER: Okay.  It's probably been a

25    while since you've looked at it I would imagine.

1    There -- there -- Mr. Clark's made several accusations

2    and -- and I just want to get your response so I can

3    kind of, you know, arrive at a -- at opinion of

4    actually what happened.  The first one is that during

5    his performance evaluation appeal which -- what --

6    what day did that occur on, do you remember?  Was it

7    in late -- late August?

8      MR. LEAVELL: It was late August.

9      GENERAL KLEMMER:  Okay.  He claims that in his

10   words -- it was -- you were threatening to him or

11   threatened him?

12      MR. LEAVELL:  No, sir.

13      GENERAL KLEMMER: Okay.  And -- and he claims that

14   you threatened to fire him during this?

15      MR. LEAVELL:  No, sir.

16      GENERAL KLEMMER:  Okay.

17      MR. LEAVELL:  Can I go into detail?

18      GENERAL KLEMMER: Yea, please do.  Please do.

19      MR. LEAVELL:  The day before, when he told me

20   that he wanted to appeal his performance evaluation to

21   me -

22      GENERAL KLEMMER: Okay.

23      MR. LEAVELL: -- I called him and Ms. Ealy into my

24   office, and I told them that we weren't going to go

25   into it today, but tomorrow morning, whatever day it

1    was, I said "tomorrow morning at 8:30 we'll meet, and

2    during this meeting I want you to bring what ever you

3    have to support your side, you know.

4         GENERAL KLEMMER:  The situation right, right.

5         MR. LEAVELL:  Right.  And about two minutes

6    later, he came back to me and said "I don't have

7    anything to support, I just know I do a good job."  I

8    said "Okay, well, whenever you -- tomorrow morning

9    we'll --"

10         GENERAL KLEMMER: What was his main -- his main

11    issue with his performance appraisal?

12         MR. LEAVELL: His main issue is that according --

13    for his own -- in his own words "You're taking money

14    out of my mouth with giving me this satisfactory --"

15         GENERAL KLEMMER: Okay.  So what was the potential

16    ratings he could have got?

17         MR. LEAVELL: It was -- well, of course below

18    satisfactory, among the best, exceeding standards, I

19    think (inaudible).

20         GENERAL KLEMMER:  Okay, and he got a

21    satisfactory?

22         MR. LEAVELL: He's got a satisfactory.

23         GENERAL KLEMMER: And that -- what that means is

24    that he doesn't get to participate in --

25         MR. LEAVELL:  At least I don't know percentage

wise or --

GENERAL KLEMMER: -- probably just bonus based upon (inaudible) but

MR. LEAVELL: Right.

GENERAL KLEMMER: -- would not be okay.

MR. LEAVELL:  Right.

GENERAL KLEMMER: Okay.

MR. LEAVELL:  And the next morning we met, and I had reviewed everything, and I supported Ms. Ealy's rating.  And he said, "Well, I don't need to hear anything else, so I don't --"  And I said, "Well, let me tell you why I support this rating."  And I brought up several incidents that had happened during that rating period.  And I said, "This incident -- because I had given him a task to accomplish --"

GENERAL KLEMMER: Uh-huh.

MR. LEAVELL: -- he told me he wasn't going to do it.

GENERAL KLEMMER:  And what was that task?

MR. LEAVELL:  Well, Mr. Laboy had instructed me to have PRO to go to the barracks and -- in the morning times between lunch -- between PT and breakfast, to -- for the case managers to build a rapport with --

GENERAL KLEMMER:  Okay, with the students?

1    MR. LEAVELL: (inaudible) He wanted that done.
2    And it wasn't being -- he called me in his office and
3    said "Look, you need to --"
4    GRIEVANCE OFFICER:  When you say he for the
5    record?
6    MR. LEAVELL:  Mr. Laboy.
7    GENERAL KLEMMER: Okay.
8    MR. LEAVELL: He called me.  He said, "You need to
9    make this happen." So, I said, "Okay".  And Mr. Clark
10   said, "No, I'm not doing it.  That's not my job.  I
11   ain't going to do it."
12   GENERAL KLEMMER:  Okay.
13   MR. LEAVELL: So I documented it as according to
14   the sheet that I have for counseling, the first thing
15   is a --
16   GENERAL KLEMMER:  Verbal warning?
17   MR. LEAVELL: -- verbal warning.
18   GENERAL KLEMMER:  Uh-huh.
19   MR. LEAVELL:  And that's what it was.  And that's
20   what I was trying to give him was a verbal warning.
21   And he yelled at me and said a few curse words
22   (inaudible) something and walked out the office, just
23   walked out.  And I changed that to a written -- I
24   bumped it up.  And I could have, under those grounds
25   -- according to the state handbook, that's hostile.



1       GENERAL KLEMMER:  Uh-huh.

2       MR. LEAVELL:  And I could have recommended

3       termination.

4       GENERAL KLEMMER: Okay.

5       MR. LEAVELL:  And that's what I was telling him

6       during this meeting.

7       GENERAL KLEMMER: Okay.

8       MR. LEAVELL: I said, "You have done some things

9       that you could have been fired for."  I said, "But I

10      chose not to go that route."

11      GENERAL KLEMMER:  Yeah.

12      MR. LEAVELL:  And that's --

13      GENERAL KLEMMER:  That's -

14      MR. LEAVELL: -- what I said.

15      GENERAL KLEMMER:  Okay.

16      MR. LEAVELL: (inaudible)

17      GENERAL KLEMMER:  Did that -- did that rating end

18      up in his personnel record or is it something you

19      kept?

20      MR. LEAVELL:  Something I kept.  I don't think it

21      made it to his personnel record.  I don't --

22      GRIEVANCE OFFICER:  Was that -- was that the

23      incident that you got up to Tess?

24      MR. LEAVELL:  It did make it in there?

25      GRIEVANCE OFFICER:  You brought it up to Tess,

10

1       but Tess gave -- gave it back to you.

2               MR. LEAVELL:  She gave it back to me?  Why did

3       she give it back to me?

4               GRIEVANCE OFFICER:  Now, I don't know, but I'm

5       asking is that the (inaudible).

6               MR. LEAVELL: I don't -- I'm not -

7               GENERAL KLEMMER: Yeah, let's don't -- we dont

8       want to speculate because it's --

9               MR. LEAVELL: Right.

10              GENERAL KLEMMER: -- It's probably more

11      information than we really need for this -- for my

12      questions so.  All right.  So -- so basically, that

13      was the issue where he -- he says that you threatened

14      to fire him was that particular -- was the appraisal

15      appeal and you didn't do that.  That's the bottom

16      line.

17              MR. LEAVELL: Right.

18              GENERAL KLEMMER:  Okay.  And -- and it -- it

19      wasn't me threatening to fire him, I was sharing with

20      him that during this rating period --

21              GENERAL KLEMMER: Yeah.

22              MR. LEAVELL: -- he had done some things that --

23              GENERAL KLEMMER:  Okay, that could have -- okay.

24              MR. LEAVELL: -- could warrant termination.

25              GENERAL KLEMMER:  Okay.  All right, I'm just

Doctor's App
Double Hernia

1    going to -- okay.  All right, next question.  Mr.

2    Clark makes a claim that -- he -- that he was required

3    to attend training despite being sick, and he provided

4    you with a doctors statement to that effect.  Did you

5    ever make him go to training even though he had a

6    doctors statement?

7         MR. LEAVELL:  This -- this -- this came out

8    during the -- his performance evaluation appeal --

9         GENERAL KLEMMER: Okay.

10        MR. LEAVELL:  -- panel and he brought that up and

11   he was referring to the document.  The doctor's

12   statement was brought up when I wanted him to go to

13   the barracks and supervise or do --

14        GENERAL KLEMMER:  Okay.

15        MR. LEAVELL: -- you know, and do what Mr. Laboy

16   wanted done.  And he brought that out during then.

17   Now, that being said, there was a required -- the case

18   managers have to be certified every three years.

19        GENERAL KLEMMER:  Okay.

20        MR. LEAVELL:  We don't know when they're -- Mr.

21   Clark and another employee are two years out of

22   certification.  I had lobbied with Doing Mighty

23   Things, which is the contractor for training for the

24   Youth Challenge program right.

25        GENERAL KLEMMER: Uh-huh.

12

1    MR. LEAVELL:  Lobbied with them to get three

2    slots.

3    GENERAL KLEMMER:  Okay.

4    MR. LEAVELL:  You know, out of -- have 25 I think

5    they had.

6    GENERAL KLEMMER:  Yeah, and where was the

7    training at?

8    MR. LEAVELL: It's -- it was in Massachusetts?

9    GENERAL KLEMMER:  Okay.

10   MR. LEAVELL:  And before anything about anything

11   being sick, the first thing out of Mr. Clark's mouth

12   and another employee, was "I'm not going.  You can't

13   make me go, period."  I tried to get to the bottom of

14   why.  "I don't have --" first -- the first thing was

15   funds.  "I don't have the money to put up front to

16   go."

17   GENERAL KLEMMER: Okay.

18   MR. LEAVELL: So I lobbied with General Johnson

19   and anybody else, Colonel Heffling (phonetic) trying

20   to get funds to pay for their travel in advance so

21   they wouldn't have to.  That was approved.  Then, the

22   -- after that was approved, then I'm not going because

23   of these reasons.  And neither employee went to that

24   training.

25   GENERAL KLEMMER: Okay.  So you're saying that --



# LITTLE ROCK SURGICAL CLINIC
### 500 SOUTH UNIVERSITY - SUITE 317 LITTLE ROCK, ARKANSAS 72205
#### PHONE: (501) 664-2434

| Lance K. Burns, M.D. | Bobby D. Perry, M.D., F.A.C.S. | Lee C. Raley, M.D., F.A.C.R.S. | Kurtis S. Vinsant, M.D., F.A. |
|---|---|---|---|
| | Diplomat American Board of Surgery | Diplomat American Board of Surgery | Diplomat American Board of Surge |
| | | Diplomat American Board of Colon and Rectal Surgery | |

DATE: 4/16/13

Re: George Clark

Pt had surgery on 3/21/13 ~~and has been cleared to return to work on~~ SEE BELOW

Restrictions are as follows: Patient may not be able to tolerate long flights that may cause prolonged sitting due to minor pain from previous surgery.

Thank You

_S. Tenner, LPN_

Little Rock Surgical Clinic

Wearing depends underwear for leakage after surgery

13

1    it -- when you said he had -- he had to go, he

2    basically came back and said, well I don't want to go,

3    I'm not going to go.

4         MR. LEAVELL: Right.

5         GENERAL KLEMMER: And -- and then when pressed for

6    a reason, he said that I don't the money to front.

7         MR. LEAVELL:  Right.

8         GENERAL KLEMMER:  But when you get the money to

9    front, and he came back with the reason that --

10        MR. LEAVELL: Right.

11        GENERAL KLEMMER:  -- said "I'm -- I've got a

12   doctors excuse, I can't go."

13        MR. LEAVELL:  Correct.

14        GENERAL KLEMMER:  Okay.  Okay.  And but -- did he

15   end up going?

16        MR. LEAVELL: Yeah.

17        GENERAL KLEMMER: Okay.

18        MR. LEAVELL:  And to this day, they're not

19   certified.

20        GENERAL KLEMMER:  Okay.

21        MR. LEAVELL:  When I -- what I ended up -- I

22   ended up sending Ms. Ealy and Ms. Moore who had just

23   recently come on board.

24        GENERAL KLEMMER:  Okay.  He -- he mentions a

25   couple of -- a couple of things about Ms. Ealy and I'm



1    going to try to -- I'll ask those all together.  He --

2    he states that she fails to show up for work on time

3    often arriving 15-45 minutes late, takes extended

4    lunch hours sometimes as much as 90 minutes, and is

5    this true?

6         MR. LEAVELL:  Sometimes she does --

7         GENERAL KLEMMER: Okay.

8         MR. LEAVELL:  -- show up late for work.

9         GENERAL KLEMMER:  Okay.

10        MR. LEAVELL:  Sometimes its anywhere from 15 to

11   45 minutes.  It has been.  It's not -- I wouldn't

12   consider it to be habitual, but yes, it occurred.

13        GENERAL KLEMMER:  Okay.

14        MR. LEAVELL:  I will say this; not one time has

15   she showed late for work -- this is what I put out to

16   my staff.  I say "Whatever your designated time to be

17   into work, if you're not going to be in at that time,

18   you need to let your supervisor or someone in your

19   chain know that you're going to be late.

20        GENERAL KLEMMER: Okay.

21        MR. LEAVELL: If you exceed the seven-minute

22   window, you have to turn in a time sheet.

23        GENERAL KLEMMER:  Okay.

24        MR. LEAVELL:  If you're there, you know, within

25   seven minutes then no time sheet is needed.

1    GENERAL KLEMMER:  Okay.  But she -- but she's

2    allowed -- she's has been late, and has she always

3    turned in leave?

4    MR. LEAVELL:  She has sometimes.  Sometimes no,

5    not all them.

6    GENERAL KLEMMER:  Okay, and that's fine, I mean

7    she -- just --

8    MR. LEAVELL: She hasn't always turned in a leave.

9    Sometimes she's made up the time on the back end

10   versus --

11   GENERAL KLEMMER:  Okay.

12   MR. LEAVELL: -- turning in a leave order.

13   GENERAL KLEMMER:  And that's fine.  That's fine.

14   That's honest, I appreciate that.  There's also a

15   couple of other accusations I'll cover.  One has to do

16   with the case load tracking matrices, and there

17   accusations made that she's not updating that, the

18   tracking matrix, their charts as -- as required.

19   MR. LEAVELL: She -- she created --

20   GENERAL KLEMMER:  Okay.

21   MR. LEAVELL: --this -- when -- Cares is our

22   program -- went off line --

23   GENERAL KLEMMER:  Okay.

24   MR. LEAVELL:  -- that we were using to report it.

25   She created this tracking matrix.  As tracking --

1    now, each -- each case manager has a -- essentially

2    the same thing to update and to report on.  What she

3    updates is only as good as the information that they

4    put in.

5         GENERAL KLEMMER:  Uh-huh.  He -- he provided me

6    examples of the matrix.  And let me -- let me -- I'll

7    show you one just as an example.  And it's -- it's on

8    file with the grievance officer so.  And I just want

9    to ask your opinion about it.

10        MR. LEAVELL:  I'm glad I brought my glasses.

11        GENERAL KLEMMER: Yeah.

12        MR. LEAVELL:  Can I get a office down here?

13        GENERAL KLEMMER:  No, not yet.  We'll -- we'll

14   fix all this.  But would you consider that one -

15        MR. LEAVELL:  No, this is not what I'm talking

16   about.

17        GENERAL KLEMMER:  Yeah, this -- this is what I --

18   yeah, this is what he claims is not being filled out

19   properly.

20        MR. LEAVELL:  No, this is -- this is not -- this

21   is not -- this is not what I'm referring to.

22        GENERAL KLEMMER:  Okay.

23        MR. LEAVELL:  I'm referring to an Excel sheet.

24        GENERAL KLEMMER:  Okay.

25        MR. LEAVELL:  Now, there is -- when Cares went

17

1    off line --

2         GENERAL KLEMMER:  Uh-huh.

3         MR. LEAVELL: -- we were instructed to come up

4    with our own tracking system.

5         GENERAL KLEMMER: Okay.

6         MR. LEAVELL: Because Cares is not in effect

7    anymore or DMARS (phonetic).  And we were told during

8    the last inspection that we had to come up with our

9    system.

10        GRIEVANCE OFFICER: (inaudible) system.

11        GENERAL KLEMMER:  Okay.  So now, what is this

12   right here?

13        MR. LEAVELL:  I've never seen this before.

14        GENERAL KLEMMER: Okay.

15        MR. LEAVELL:  This is my first time.

16        GENERAL KLEMMER: Yeah, this is -- of course,

17   there's initials on that, and I think those are his

18   initials.

19        MR. LEAVELL:  Right.  This is not what I -- I

20   have her to send me a --

21        GENERAL KLEMMER:  You're talking about Ms. Ealy,

22   right?

23        MR. LEAVELL: Right.

24        GENERAL KLEMMER: Okay.

25        MR. LEAVELL:  Ms. Ealy.  A monthly report, but

18

1    that's in an Excel format.

2         GENERAL KLEMMER:  Okay.

3         MR. LEAVELL:  That shows me what tracking has

4    been done, where they are.

5         GENERAL KLEMMER:  Okay.  Now, where would --

6    where would this come -- what -- what -- what actually

7    is this would you say?

8         MR. LEAVELL:  I have never seen this before at

9    best.

10        GENERAL KLEMMER:  Okay.

11        MR. LEAVELL: I would -- to me what this looks

12   like is -- looks like a CQ log.  But it -- I mean

13   that's exactly what it looks like.

14        GRIEVANCE OFFICER:  Sir, grievance officer asks

15   permission to speak.

16        GENERAL KLEMMER: Yeah.

17        GRIEVANCE OFFICER:  Sir, this Exhibit B, these

18   tracking forms are on the front of each case file of

19   each of the cadets, and from this tracking form, they

20   use these forms to input the information on the Excel

21   spreadsheet.

22        MR. LEAVELL:  Okay.  What I look at is the Excel

23   spreadsheet.

24        GENERAL KLEMMER:  Okay, so what she -- what she

25        GRIEVANCE OFFICER:  This -- this is -

19

1          GENERAL KLEMMER: Okay.

2          GRIEVANCE OFFICER:  (inaudible) yeah.

3          GENERAL KLEMMER:  So what probably could be

4      happening is that she's entering hers directly into

5      the system and not putting it on this?

6          GRIEVANCE OFFICER:  Well, no sir.

7          GENERAL KLEMMER: Okay.

8          GRIEVANCE OFFICER:  Those are not updated.  The

9      system on hers, she did not have any updated at all.

10         GENERAL KLEMMER: Okay.

11         GRIEVANCE OFFICER:  She stated that the system

12     was corrupt.

13         GENERAL KLEMMER: Okay.

14         GRIEVANCE OFFICER:  But, yet her employees were

15     using that to change --

16         MR. LEAVELL:  Well she, from my understanding on

17     that, she created -- and you can -- if you look at our

18     systems --

19         GENERAL KLEMMER:  Okay.

20         MR. LEAVELL:  -- you can tell when a file has

21     been -- it -- it's there.

22         GENERAL KLEMMER:  Uh-huh.

23         MR. LEAVELL:  The file is there.

24         GRIEVANCE OFFICER:  There, uh-huh.

25         MR. LEAVELL:  And you can tell when it's been

1    corrupted.  I mean, it'll tell you that.

2        GENERAL KLEMMER: Yeah.

3        MR. LEAVELL: Who corrupted -- I know -- I know --

4    I can this; on one particular weekend in August, she

5    -- on a Friday, she showed me --because they're on the

6    server -- she showed me Mr. Clark's Excel worksheets.

7        GENERAL KLEMMER: Okay.

8        MR. LEAVELL:  And the entries were duplicated and

9    it was -- this is September, and it was filled out all

10   the way to December, already, of 2013.  And when we

11   came in Monday she showed me -- he had came in

12   Saturday and tried to clean it up, but the date/time

13   stamp was still on.  You could see it.

14       GENERAL KLEMMER: Yeah.

15       MR. LEAVELL:  I mean, it was right there, where

16   he came in and tried to fix -- because she had

17   mentioned it.  She said, "Why do you have this already

18   filled out until December, and we're here in

19   September?"  And he came in Saturday on his own time

20   and tried to fix it.

21       GENERAL KLEMMER: Uh-huh.

22       MR. LEAVELL:  Prior to -- when we got in

23   Monday —

24       GENERAL KLEMMER:  Okay.

25       MR. LEAVELL: -- you know, we -- we saw where he

1    had -- the date/time stamp was on the computer.  Now,

2    one thing was –

3        GRIEVANCE OFFICER:  Can you show me in these

4    spreadsheets (inaudible) so –

5        GENERAL KLEMMER: Okay.

6        GRIEVANCE OFFICER:  -- June, she didn't -- on

7    hers she stated that she did not have any updates.

8        GENERAL KLEMMER: Okay.

9        GRIEVANCE OFFICER:  The tracking form, matrix

10    tracking form, that information is used to update

11    these spreadsheets.

12        GENERAL KLEMMER:  Okay.  So there's potential

13    that --

14        GRIEVANCE OFFICER:  Yeah, and she admitted that

15    she had not updated them.

16        GENERAL KLEMMER:  Okay.  Okay.

17        GRIEVANCE OFFICER:  For the record; to me and

18    Tess.

19        GENERAL KLEMMER:  Okay, so -- okay so -- so we've

20    got a -- okay, so there's a -- there is an issue with

21    updating, okay.  I -- I just wanted -- I want -- what

22    I wanted to do was to establish that.  That we -- we

23    are lacking in -- and probably across the board --

24    lacking in updating the matrix, and I want to just get

25    that out for the record.  Okay.  The -- the other

1   question that I have is related to Mrs. Ealy's

2   unprofessional language.  Mr. Clark complains that she

3   often uses profanity and racial slurs in the office.

4   Have you witnessed any of that?

5        MR. LEAVELL:  No, sir.

6        GENERAL KLEMMER: Okay.

7        MR. LEAVELL:  I have not.

8        GENERAL KLEMMER:  Okay.  All right.  And then

9   there's several things and -- and I, you know, please

10   forgive me up front, but I'm going to ask you some

11   questions -

12        MR. LEAVELL: That's fine.

13        GENERAL KLEMMER: -- that you may not like but,

14   At any time and you can just yes or no.  You can

15   elaborate if you want.  At any time have you ever

16   requested that Mr. Clark rub your back because your

17   back was sore or anything like that?  Going back many

18   -- several years ago, four years ago?

19        MR. LEAVELL: Wow!  I don't know.

20        GENERAL KLEMMER: Okay.

21        MR. LEAVELL: I don't know.

22        GENERAL KLEMMER: Okay.

23        MR. LEAVELL:  Now, I -- I will say this -- I will

24   say this.  At -- at -- at the point in time that I was

25   a recruiter, Mr. Clark and I, Mr. Berkley I mean we

23

1    were, you know, pretty tight.

2          GENERAL KLEMMER: Yeah.

3          MR. LEAVELL:  So is that possible, that I could

4    have said it? Yes.

5          GENERAL KLEMMER:  Okay.

6          MR. LEAVELL:  But I don't know.  I don't know.

7    It's -- our differences came when I became their

8    supervisor.

9          GENERAL KLEMMER:  Okay.  But that's -- that's

10   fine.  He mentioned several other items -- incidents

11   that are -- occurred in his words about four years

12   ago.  And I know that's a long time ago, but -- and

13   I'll take that into consideration as well.  He

14   mentions about showing pornography on a cell phone.

15   Do you -

16         MR. LEAVELL:  No, sir, I don't.

17         GENERAL KLEMMER:  Don't remember?  Have you ever,

18   in either a joking or serious manner, threatened him

19   with a gun?  And again, this goes back several years

20   ago.

21         MR. LEAVELL: We've -- threatening him?  We've

22   never had that type of -- we've never had --

23         GENERAL KLEMMER:  Conflict, right.

24         MR. LEAVELL: -- right.  We've never had any

25   conflict between us at all until I became --

1    GENERAL KLEMMER: (inaudible) but Yeah -- but it

2    is something here four years later that he can say

3    well I can use that?  Is that possible?

4    MR. LEAVELL:  Sir, I don't --

5    GENERAL KLEMMER:  You don't remember, okay.

6    MR. LEAVELL: I don't remember ever threatening

7    anybody -

8    GENERAL KLEMMER:  Okay.  That's fine.  That's

9    fine.

10    MR. LEAVELL: -- with a weapon.

11    GENERAL KLEMMER:  Okay.  Okay.  Have you -- have

12    you -- and this is really -- this is my last question.

13    Have you conducted any verbal or written counseling

14    for Ms. Ealy on anything since she has worked for you?

15    MR. LEAVELL:  Yes, sir.

16    GENERAL KLEMMER:  Okay.

17    MR. LEAVELL:  And I have -- I have those on file

18    as well.

19    GENERAL KLEMMER:  Okay, okay.

20    GRIEVANCE OFFICER:  Did you want copies of them

21    sir?

22    GENERAL KLEMMER: No, I just want to ask the

23    question.  And -- and can you tell me the nature.

24    MR. LEAVELL: One was as when Ms. Ealy -- when Ms.

25    Ealy first took over as supervisor, there's a lot of

1     -- I mean, I knew what she was faced with because Ms.

2     Nix that just went through the same -- same thing.

3          GENERAL KLEMMER:  Yeah.

4          MR. LEAVELL:  I said, "Listen, you need to

5     counsel these people that works with you on a monthly

6     basis so when you get ready to do this performance

7     evaluation, you've got this in writing."  That hadn't

8     been done.

9          GENERAL KLEMMER: Okay.

10         MR. LEAVELL:  So that's one of the things that

11    I've counseled her on.

12         GENERAL KLEMMER: Okay.

13         MR. LEAVELL:  The other thing that I would

14    consider negative is one, them going out on the road.

15    Because I had a staff meeting and I told PRO, "If you

16    don't have contact within a two-month time period with

17    your clients, I want you knocking on the door."  That

18    hasn't happened.

19         GENERAL KLEMMER:  Okay.

20         MR. LEAVELL:  And maintaining -- by the

21    cooperative agreement, we're supposed to maintain 75

22    percent placement for our cadets.    That hasn't

23    happened.  So those are three things I know I've

24    talked to her about.

25         GENERAL KLEMMER:  And that's under --

*WITNESS Berkley 2015*

*Try "Shawny pornography to Mr Berkley And I. Witness Mr. Leavell threatning with gun.*

11

1    in the office. I didn't think anything of it, but he

2    has.

3            GENERAL KLEMMER: Okay.

4            MR. BERKLEY: That was a couple years ago.

5            GENERAL KLEMMER: And did -- back at that time,

6    did they have a good -- a friendly relationship would

7    you say or --

8            MR. BERKLEY: Not really. The atmosphere has

9    always -- well, since I gotten [sic] over there --

10           GENERAL KLEMMER: Was tense, okay. At any time,

11   have you seen Mr. Leavell show Mr. Clark any

12   pornography on Mr. Lavelle's phone?

13           MR. BERKLEY: Yes, sir.

14           GENERAL KLEMMER: And how long ago was that have

15   been?

16           MR. BERKLEY: Maybe about two years ago, two

17   maybe three.

18           GENERAL KLEMMER: Okay. Two plus years ago,

19   okay.

20           MR. BERKLEY: On some traveling we were doing.

21           GENERAL KLEMMER: Okay. All right. And have you

22   seen Mr. Leavell ever threaten Mr. Clark with a gun in

23   a joking or serious manner?

24           MR. BERKLEY: Yes, sir.

25           GENERAL KLEMMER: Okay. How -- how --

28

CERTIFICATE

STATE OF ARKANSAS    )
                     )ss
COUNTY OF PULASKI    )

        I, DAWN FREDERICK, Certified Court Reporter, do hereby

certify that the foregoing 17 pages were transcribed by me to

the best of my ability from an audio recording provided to me. I

therefore, cannot attest to the authenticity of the recording

nor the identity of the parties, only to the contents of the

recording.

        I FURTHER CERTIFY that I am neither counsel for,

related to, nor employed by any of the parties; and further,

that I am not a relative or employee of any attorney or counsel

employed by the parties hereto, nor financially interested, or

otherwise, in the outcome of this action.

        WITNESS MY HAND AND SEAL this 31st day of December,

2013.


                        DAWN FREDERICK
                        Certified Court Reporter #536

12

1    MR. BERKLEY:  That happened at the office.  It
2    was earlier, in fact, maybe twice.

3    GENERAL KLEMMER:  Okay.  So --
4    MR. BERKLEY:  I have witnessed that twice.
5    GENERAL KLEMMER:  How long ago?

6    MR. BERKLEY:  Maybe about the same, about two,
7    three years ago when he was in the crew.

8    GENERAL KLEMMER:  And how -- how -- how did it
9    play out?  Was it joking or was it -

10   MR. BERKLEY:  Well, it started off as a joke.  It
11   started off as a joke and then it kind of got serious.
12   But whenever stuff kind of get serious, I'll get up
13   and go out.

14   GENERAL KLEMMER:  Yeah.

15   MR. BERKLEY:  So -- because I don't want to
16   witness anything or try to -- Mr. Coley (phonetic), in
17   fact, was in there --

18   GENERAL KLEMMER:  Okay.

19   MR.  BERKLEY:  -- during the times, so --

20   GENERAL KLEMMER:  Okay.

21   MR. BERKLEY:  -- I don't remember exactly how it
22   panned out, but I do remember --

23   GENERAL KLEMMER:  Okay.

24   MR. BERKLEY:  -- that it kind of got a little
25   tense.

1    GENERAL KLEMMER:  Okay.  They got in an argument

2  or something like that or --

3    MR. BERKLEY:  It was kind of like an argument.

4  George didn't take it too well --

5    GENERAL KLEMMER:  Okay.

6    MR. BERKLEY:  -- with that, you know, with the

7  gun playing, joking.  He didn't take it too well, so.

8    GENERAL KLEMMER:  Okay.  Okay.  But he did -- do

9  you know if he ever complained to anybody about it

10  or --

11    MR. BERKLEY:  He's mentioned --

12    GENERAL KLEMMER:  I mean to you, other than you?

13    MR. BERKLEY:  No, no, to Mr. Coley.

14    GENERAL KLEMMER:  Okay.

15    GRIEVANCE OFFICER:  Mr. Coley was the then

16  supervisor.

17    MR. BERKLEY:  Uh-huh.

18    GENERAL KLEMMER:  Okay.  Okay.  And the next

19  questions are going to be concerning just a couple

20  things concerning Ms. Ealy regarding her -- her work

21  attendance.  Did she come in late often?

22    (No audible response)

23    GRIEVANCE OFFICER:  Speak on the record.

24    GENERAL KLEMMER:  How often?

25    MR. BERKLEY:  Yes, yes, yes, sir.

1   understandable because that's just your role as a

2   supervisor.  That's what you do, okay.

3   　　　　MR. LEAVELL:  And -- and -- and I will say a lot

4   of things that they don't see --

5   　　　　GENERAL KLEMMER:  Uh-huh.

6   　　　　MR. LEAVELL:  -- they don't know.

7   　　　　GENERAL KLEMMER:  Right.  Yeah, and that's --

8   that's part of -- perception is part of the problem,

9   so.  Those are all my questions.  Do you have any

10  questions of me or anything you want to ask?

11  　　　　MR. LEAVELL:  Just one thing.  A lot of -- a lot

12  of -- I mean, we're going back four years in some

13  cases.  If there's a problem, don't -- if you've got

14  time to document all this stuff, when was you doing

15  your job for one.  For two, if you have a problem with

16  something at the moment, at the time it happened --

17  　　　　GENERAL KLEMMER:  Uh-huh.

18  　　　　MR. LEAVELL:  -- that's when you should raise

19  that issue.  Three, I think this office is being used

20  as a escape [sic] goat.  Because, I mean, so many

21  times and not just with Mr. Clark, but so many times

22  all I hear -- and not even from my section, from other

23  sections -- I'm going DSR, I'm going -- I don't know

24  if this office was created for that type of role or

25  not.  But when I read in the thing -- and it does talk

27

1    about sexual harassment and discrimination, I read

2    that.

3          GENERAL KLEMMER: Uh-huh.

4          MR. LEAVELL:  But a lot of things that should be

5    solved by the chain of command, the chain of command

6    isn't even aware about.

7          GENERAL KLEMMER:  Right.

8          MR. LEAVELL:  Aware of.  And -- and to me that's

9    a

10   GENERAL KLEMMER: Uh-huh.

11         MR. LEAVELL:  -- that's a problem.

12         GENERAL KLEMMER: Well, I -- I appreciate the

13   input with that.  and -- and -- and again, the time

14   line, you know, this being four years ago definitely

15   is taken into consideration so.

16         MR. LEAVELL: And I -- one more thing for the

17   record.  I think -- I don't even think this grievance

18   would have been filed had he got his way on his

19   performance.  Timing is suspect should I say.

20         GENERAL KLEMMER: Okay.  Is that it?

21         MR. LEAVELL:  That's all I have.

22         GENERAL KLEMMER: Thank you very much.

23         GRIEVANCE OFFICER:  Thank you, We're off the

24   record.

25               END OF RECORDING

July 2, 2019

The Youth Challenge Principle (Mr. O'Leary) came to our PRO office and Quoted "Some of these Kids can't think past their DICKS" Mr. O'Leary was very loud, when making that statement. Mr. Hugh Leavell didn't confront Mr. O'Leary about his language.  Co- workers Mr. Todd Nodurfth and Mrs. Christina Raatz witness Mr. O'Leary statement.

493-2019-01328

July 16, 2019

Mr. Phillips,

During a staff meeting, which started at 9:00 am. Supervisor
Hugh Leavell stated, if people not happy here find employment

Elsewhere.

It making it a hostile working environment for the department.

Supervisor Mr. Leavell comments were towards me. Mr. Leavell
continue to retaliate and harass me. Once again he stated a meeting
with individual staff will take place soon, with him.

George R. Clark



July 16, 2019                                      493-2019-01328

Mr. Phillips,

I meant to give you this statement, when we had our meeting on the ninth of July 2019.  The Youth Challenge Principle (Mr. O'Leary) exact words on July 2, 2019.  Mr. O'Leary is also a white male.

Please see attachment:


George R. Clark

August 12, 2019

Rita Barnes

EEOC

820 S Louisiana Street Number 200

Little Rock, AR 72001

Re Charge: 493-2019-01328



August 12, 2019

Position Statement Reply

George R. Clark

Career Planner & Placement Specialist

Arkansas Youth Challenge Program Bldg. 16416

Position Statement Reply EEOC Charge # 493-2019-01328

## Current Charge

I was hire as a cadre in 2004, then to a case manager in 2006. I had three Grievance hearings, which Mr. Hugh Leavell and Mrs. Regina Ealy was removed from PRO building. (2014) they were moved for creating a hostile working environment and harassing me.

On January 30, 2019 I e-mailed Mr. Joe Mallett and CC. Mr. Christopher Stanger also Mr. Billy Ward. Mr. Stanger called for Mr. Mallett and me to his office. When entering his office, the first words he quoted. I know how to get some attention. I replied, I am trying to protect my job. By putting Mr. Leavell over me once again.

Retaliation # 493-2017-01191


Please see exhibits A through G


Racism and Race

July 3, 2019

The principle came to our office quoting, you know this kid can't think past their DICkS. He is a white male.  Mr. Leavell didn't say nothing to him at all. Mr. O'Leary was very loud. Witness by other in office Mrs. Christy Raatz and Todd Nordurfth.

May 24, 2019

Mr. Todd Nordurfth (case manager) refused an order to drive families from the front gate to Youth Challenge grounds. Mr. Leavell stated you need to follow orders and Mr Leavell stated the orders came from Mr. Mallett and Mr. Ward. Mr. Nordurfth told Mr. Leavell I don't care who told you. I not driving and get you're other staff to drive. Mr. Nordurfth is a (white male). No verbal or written write up.

Mrs. Christy Raatz is a case manager (white female) state Mr. Leavell has seen her in tennis shoes on several occasion. No verbal or write ups.

## Conclusion

I was written up for not meeting with Mr. Leavell Supervisor (Mr. Ward) On July 26 2019 I was written up for not going through chain of command. I went to Mr. Mallet to explain my child had a dentist appointment for July 29. 2019. Mr. Leavell ordered me to take a cadet on the July 29, 2019. My dentist called me on the 26 of July. To remind me of appointment. JFK verified with Mr. Mallett the time and date. Mr. Ward which is Mr. Leavell supervisor was on vacation from July 22, 2019 through July 26, 2019. My next chain of command was Mr. Mallett. MR MATlett STATEd I TOld Them Mr. WArd wAs off the day of July 26 2019. Mr. MAllett STATe ma on Aygust 9, 2019 I have been subjected to retaliation, harassment and Hostile work environment. Mr. Leavell show workplace violence the afternoon by beating on my cubicle shouting Mr. Clark, beating several times on my door. My coworker could not believe it. I have been threat on with a gun in the past. Mr. Leavell made me fear him. Witness by Ms. Edwards, Mr. Berkley, and Mrs. Raatz I am currently in Therapy for his action.

The Grievance officers Ms. Flowers and Terresa Galbraith are witness for the past retaliations and harassment of Mr. Leavell In 2014

See Eyhibits A - G

## Smoking Policy

Smoking and/or use of smokeless tobacco is prohibited inside all buildings, hangars, lounges, vehicles, and aircraft owned or operated by the Arkansas Army or Air National Guard. Additionally, the use of any tobacco product is banned within 25 feet of the entrances of all buildings and hangars. All buildings will have signs posted at the entrances indicating that smoking and the use of smokeless tobacco is prohibited except in designated areas.

Commanders and supervisors will designate "outdoor tobacco use areas," which are reasonably accessible to provide a measure of protection from the elements, when possible. Tobacco use areas should be outdoors and away from common points of ingress and/or egress of National Guard facilities. It will not be in front of a building or near the intake ducts.

## Workplace Violence

People are our most important resource. With that in mind, the Arkansas Military Department is committed to our employees' health and safety. Violent and/or harassing or threatening behavior in the workplace, which harms or instills fear in others, is an unacceptable way of dealing with problems no matter how severe the problems may be. We must not only safeguard our workforce from overt acts of violence, but also from harassment, intimidation and threats which adversely affect employee morale, workforce well-being and workforce efficiency.

There will be "Zero Tolerance" in the Arkansas Military Department for disruptive behavior. "Zero Tolerance" means swift and appropriate disciplinary action against personnel engaging in violent or criminal acts. Harassing, intimidating, and/or threatening words or acts which cause fear in others will not be tolerated. No person who makes a threat or commits a violent act should expect to maintain privacy in those areas that need investigating to assure a safe work environment.

You have the responsibility to utilize the chain of command in notifying supervisors of any threats that you have witnessed, received, or heard about from another person. You should also alert your superior of any behavior you have witnessed which you regard as threatening, intimidating, harassing, or violent which adversely affects employee morale, workforce well-being, and workforce efficiency. Upon investigation, superiors will take appropriate action to resolve the issue. Moreover, you may notify police or security officers in the event of criminal behavior. Criminal behavior will be prosecuted to the fullest extent of the law.

## Reduction in Force Policy

It may become necessary to transfer, reassign, relocate or lay off employees due to a lack of funds, curtailment of work, changes in the delivery of program services, discontinuance of programs and/or positions, or for other reasons. Should any of these conditions occur the State Military Department shall make the determination as to whether the circumstances or conditions warrant a Reduction-In-Force (RIF) action and a RIF Procedure shall be implemented.

10/30/19                                    493-2019-01328

Mr. Rodney Phillips,

       One of my coworker Mrs. Christina Raatz (white female) she is wearing tennis shoes today and Supervisor Hugh Leavell haven't written her up or gave her verbal warning. On June 5 2019, I was written up for wearing tennis shoes for one day, because of foot injury.

       I tried to explain to Human Resources Director Mr. Christopher Stanger about foot injury, His reply was I should have went to the doctor.  My coworker Mrs. Raatz have worn tennis shoes on several occasions without no discipline. Human Resources and Mr. Leavell continues to retaliate against me, which effects my health and mental state. I continue to have Therapy visits with Therapist Mr. Jentry Tilman.  My only two write ups ever in fifteen years have been from Mr. Leavell. The retaliation is from the past, when Mr. Leavell was found guilty of creating a Hostile environment and harassing me, Also his removal from PRO Building in year 2006. Once again, Mr. Leavell have convinced the new Humane Resources Director Mr. Stanger, the Youth Challenge Director Mr. Mallett that I am a disruptive employee. My grievance hearings transcripts I submitted is telling the truth.



Ms Flowers

Grievance officer 2013-2014

Witness for my Case.

(501) 563-8546

Continues To work AT DSR
Human Resources
Another Title

V.      Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal
arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include
the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any
punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or
punitive money damages. Pain And Suffering due to the negligent
People of Arkansas Youth Chiallenge And Human Resources
The punitive damages Are $500,000. My Family endured
my mental And Stress.

VI.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information,
and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a
nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the
requirements of Rule 11.

A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case   related papers may be
served.  I understand that my failure to keep a current address on file with the Clerk's Office may result
in the dismissal of my case.

Date of signing:        6/19/20

Signature of Plaintiff   George R. Clark

Printed Name of Plaintiff  George R. Clark

Page of   6

B.   For Attorneys

Date of signing:        _____

Signature of Attorney    _____
Printed Name of Attorney _____
Bar Number               _____
Name of Law Firm         _____
Street Address           _____
State and Zip Code       _____
Telephone Number

M360 (Amtrak) - gtclarkboys@yahoo.com - Yahoo Mail

E-mail Address

Page of   6



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Little Rock Area Office**

820 Louisiana St., Suite 200
Little Rock, AR  72201
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
FAX (501) 324-5991
Website:  www.eeoc.gov

March 31, 2020

George Clark III
3907 Hillside Drive
North Little Rock, AR 72118

Re:     Clark v. Arkansas Military Department
        EEOC Charge No.: 493-2019-01328

Dear Mr. Clark:

The purpose of this letter is to advise you of the evidence obtained in the investigation of your charge of discrimination.  On July 30, 2019, a copy of the Respondent's position statement was electronically sent to you.  After receiving your response, all evidence collected during the investigation was thoroughly reviewed.  The investigation revealed the following facts:

You alleged you were subjected to a hostile work environment, harassed, disciplined, given additional duties, and reassigned a previous harasser in retaliation for filing a previous complaints/EEOC charges; and you alleged you were disciplined because of your race (Black); all in violation of Title VII of the Civil Rights Act of 1964, as amended.

The evidence shows you filed previous EEOC charges in September 2013 and February 2014—both resulted in no-cause findings and Rights to Suits being issued in December 2014. Furthermore, Respondent met with you to discuss Hugh Leavell (Black) becoming your supervisor. Your complaint was against Regina Ealy, not Hugh Leavell.  Respondent asserts you have refused to allow them to copy documents you are referencing that Hugh cannot be your supervisor as all their documents for 2014 were destroyed.  Additionally, evidence shows you were given a verbal warning for violation of dress code and not having respectful interaction by someone of the same race as you.  The EEOC is unable to conclude that there was a violation under the laws we enforce.

If you have additional documentation which will refute the above evidence, it must be provided in writing via email ONLY to rodney.phillips@eeoc.gov within 10 days of the date of this letter. Otherwise, you will be notified of the Director's determination in this matter by mail.   The Director's determination will conclude the processing of this charge by EEOC, but you will have the right to pursue the matter by filing in Federal District Court.  If you decide to sue, you must do so within 90 days from your receipt of the Dismissal and Notice of Rights; otherwise, your right to sue is lost.

Sincerely,

*Rodney Phillips*
Rodney Phillips
Federal Investigator